**STATE of Missouri, Respondent,**

v.

**Cecil BARRINER, Appellant.**

No. SC 81666.

Supreme Court of Missouri.
En Banc.

Dec. 27, 2000.

Deborah B. Wafer, Asst. Public Defender, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for Respondent.

COVINGTON, Judge.

Appellant, Cecil Barriner, appeals his convictions and death sentences for two counts of first degree murder, section 565.020, RSMo 1994, for the murders of Irene Sisk and her granddaughter, Candace "Candy" Sisk. Reversed and remanded.

## I.

Viewed in the light most favorable to the verdict, *State v. Werner*, 9 S.W.3d 590 (Mo. banc 2000), the facts are as follows. In December 1996, appellant began to fear that he had failed a urinalysis test for the presence of controlled substances. Appellant was concerned that his probation would be revoked. Resolving to leave his residence in Poplar Bluff, appellant planned to travel to the Tallapoosa, Missouri, residence of nineteen year old Candy Sisk and Irene Sisk, Candy's seventy-four year old grandmother, to obtain money from them. Appellant had been in a relationship with Candy Sisk's mother, Shirley Niswonger, from 1993 until 1996, and during that time had become acquainted with Candy. Appellant had accompanied Niswonger on at least two occasions when she traveled to the Sisks' house to borrow money. Appellant believed that the Sisks were financially well-to-do.

Late in the afternoon of December 15, 1996, appellant visited Daniel and Samantha Simmons, friends who lived only a few miles from the Sisk residence. Appellant told Samantha Simmons that he was going to Tallapoosa to collect some money and drove away in the white Ford Taurus automobile he was using for transportation. He returned shortly thereafter, stating that no one had been home. Daniel and Samantha Simmons then accompanied appellant to Tallapoosa in the Ford Taurus, where appellant passed by the Sisk house three times. During the drive, appellant said that "the girl was going to pay him some money" and pointed to a note that he

had left on the Sisks' door. Samantha Simmons noticed that during the drive appellant held and played with a purple Crown Royal bag that contained something that she could not see.

On December 16, at approximately 8:45 a.m., Candy telephoned her aunt, Debbie Dubois, and reported that a man had been to the house a short time before. Candy told Dubois that the man had told Irene that he had "a Christmas gift for Candy from her mother in jail." Candy told Dubois that her grandmother said that the man had acted strangely, and that the same man had been in Tallapoosa the day before asking for directions to the Sisk residence. Candy reported that she had not seen the man herself, but had observed the man's car, which was a white Ford Taurus. Dubois attempted to telephone a relative to ask him to check on Irene and Candy but was unable to reach him. Dubois then called Candy, told her she had failed to reach the relative, and instructed Candy to call her again if the man returned.

Several minutes after 9:00 that morning, a bank teller at a bank in nearby Risco attended to a man driving a white Ford Taurus. The teller saw Candy riding in the passenger seat, dressed in a nightgown and wrapped in a blanket. The teller saw another person in the rear seat. The driver gave the teller a check in the amount of one thousand dollars, signed by Candy and to be drawn on her account. After having Candy sign the required cash receipt, the teller gave the man one thousand dollars in cash, with one hundred dollars in twenty dollar bills, as the driver requested.

At approximately 10:45 that morning, Dubois attempted at least twice to telephone Candy and Irene at the Sisk residence. The telephone rang repeatedly, but no one answered. Dubois was concerned because one telephone line had an answering machine and because Candy, who had undergone back surgery four days before, was not supposed to leave the house for six weeks. Dubois drove to the Sisk house. There she found Candy and Irene dead. She tried to call the police, but, upon finding that the telephones in the house were missing, she drove to see a relative, who notified the authorities.

Candy's body was on the bed in her bedroom. Her hands were bound in front of her with rope. She was unclothed below the waist. A pair of sweatpants and a pair of panties were on the floor nearby. Her neck had been slashed six to eight times. A knife protruded from her chest. An autopsy revealed that Candy bled to death from the neck slashes, and that the knife was thrust into her chest after she died. Several bite marks were identified on her left breast. She had been anally violated with a blunt object at or after the time of her death, resulting in lacerations to her rectum and vagina.

Irene's body was on the floor of her bedroom next to the bed. She had been hog-tied, her wrists and ankles bound together with the same length of rope. An autopsy revealed that seventeen superficial stab wounds in a localized area on her left chest, five of which penetrated the chest cavity and lung, were inflicted fifteen to forty-five minutes before she died. Three deep slashes to her throat caused her death.

A routine investigation of the murder scene led to several relevant discoveries. Officers found the purses of Candy and Irene near their respective bodies; each had been opened, and there were two checkbooks lying near Irene's purse. In one of these checkbooks a check for one thousand dollars had been made out to cash but was not signed. A television and VCR were missing from Candy's bedroom. Officers found an empty box for a videotape of the movie "Independence Day" near where the VCR had been. Multiple telephones in different areas of the house were disabled or missing. A utensil drawer in the kitchen of the residence was smeared with Irene's blood.

Some time after the deaths of Irene and Candy, appellant checked into a motel in Poplar Bluff. Appellant paid for the room in cash and told the clerk that he wanted to be alone. Later that afternoon, appellant visited Kevin Dennis and gave him a VCR for use in salvaging parts. Appellant also changed clothes while at Dennis's house.

On December 18, two days after the bodies of Irene and Candy were discovered, Lieutenant Steven Hinesly of the Missouri State Highway Patrol and Deputy Sheriff Scott Johnston of Butler County contacted appellant at his brother's home. Appellant agreed to accompany the officers to troop headquarters in Poplar Bluff to discuss the homicide. Appellant denied knowing that the Sisks had been murdered and denied killing them. Appellant claimed to have made trips to Cape Girardeau and two other towns on the morning of the murders to do some Christmas shopping. When Lieutenant Hinesly professed skepticism that appellant could have traveled so far so quickly, appellant changed his story; he then claimed that he was using methamphetamine at the home of Kevin Dennis when the murders were committed.

The next evening, Lieutenant Hinesly again interviewed appellant, this time at the Butler County Sheriff's office. After reading appellant his *Miranda* rights, Hinesly told appellant that the story concerning Dennis had not checked out, and that the police had discovered other information since appellant's first interview. At that point, Hinesly observed, appellant "became depressed" and said that he wanted to tell the truth but could not. Appellant then asked to speak to his brother. After consulting with his brother for a short time, appellant admitted that he had murdered Irene and Candy.

Appellant told Lieutenant Hinesly that Irene and Candy had disagreed over whether to give appellant money, and that Irene had begun to write a check but never finished it. Candy finally wrote a check. Appellant drove Candy and Irene to the bank, where Candy cashed the check. Appellant said that his intention upon returning to the Sisk residence was to tie up Irene and Candy so that he had time to leave town safely. Lieutenant Hinesly further testified that appellant said that he tied up the Sisks, but as he was leaving the house he saw that Irene had already managed to free herself. Appellant stated that he reentered the house to retie Irene, during which time Irene reached for a knife. Appellant also stated that Irene and Candy would not stop screaming, and that he "shut them up ." Appellant said that he had worn gloves when he went to the Sisk residence so that his fingerprints would not be discovered by police. He also said that he had thrown from the window of his car a camouflage jacket that he had been wearing because it had blood on it. Appellant stated that he had checked into the Tower Motel when he returned to Poplar Bluff because he was afraid that he was being followed. Appellant denied having sexually assaulted Candy and told officers that they would not find his semen at the scene of the murders. Appellant later observed to Lieutenant Hinesly that "the ironic thing" about his situation was that appellant had learned since the murders that he probably would not have had to return to jail "just for failing one piss test."

On the evening that appellant confessed to the murders, police obtained and executed a search warrant for the home of appellant's brother, where appellant usually resided. Police found thirty-two ropes and cords in appellant's room. Tests established that two of the ropes were consistent in color, composition, and construction with the ropes that had been used to bind Candy and Irene. In the room's wastebasket, officers found several handwritten notes. One note contained directions from Poplar Bluff, appellant's place of residence, to the Sisk residence. A second note contained the name "Can-

dace" and an indication that she lived in Gideon, Missouri. Another note read:

*Things for First Entrance*

Gun (back)—Handcuffs (pocket)—12 ft of rope (legs) in two 6 ft pieces Officers also found in appellant's room a purple Crown Royal bag containing handcuffs; a red duffel bag containing ropes and dildos; homemade sex videos; a bondage magazine; a videotape of the movie "Independence Day" without a box; appellant's wallet, which contained $123 including six twenty dollar bills; and three telephones.

Officers seized and processed the white Ford Taurus that appellant had been driving and found traces of blood on the driver's armrest, the door handle, the steering wheel, and the trunk clasp. The blood on the steering wheel was found to be human blood. According to testimony regarding DNA analysis, the blood on the door handle was consistent with a mixture of a small amount of appellant's DNA and a larger amount of Irene Sisk's DNA.

The jury found appellant guilty of two counts of first degree murder.

During the penalty phase of the trial, the state introduced appellant's prior conviction for possession of a controlled substance and presented evidence concerning the impact of the victims' deaths upon their family and friends. Appellant presented testimony of family and friends in mitigation of punishment and offered evidence to the effect that he had been a model prisoner while awaiting trial.

At the close of the evidence, instructions, and arguments by counsel in the penalty phase, the jury was unable to reach a verdict on punishment. The trial court, therefore, sentenced appellant. The court found seven statutory aggravating circumstances on each of the two counts of first degree murder: the murder was committed while defendant was engaged in another unlawful homicide, the murder was committed for the purpose of receiving money and other things of monetary value, the murder involved torture and depravity of mind, the murder was committed while defendant was engaged in the perpetration of burglary, the murder was committed while defendant was engaged in the perpetration of robbery, the murder was committed while defendant was engaged in the perpetration of kidnapping, and the victims were murdered as a result of their status as potential witnesses against the defendant. The court sentenced appellant to death on each count of first degree murder.

## II.

Appellant's first five points on appeal allege common issues of law. In each, appellant claims error in the admission of evidence that appellant characterizes as evidence of prior uncharged misconduct. Appellant contends that the trial court's erroneous admission of the evidence violated his due process rights, his right to be tried only for the offenses charged, his right to present a defense to the charged offenses, his right to a fair and impartial jury, and his right to reliable sentencing guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 10, 14, 17, 18(a), and 21 of the Missouri Constitution.

As a general rule, "evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993). "When not properly related and logically relevant to the crime at issue, the introduction of other crimes evidence violates the defendant's right to be tried only for the offense for which he is charged." *State v. Clover,* 924 S.W.2d 853, 855 (Mo. banc 1996). If, however, evidence of prior misconduct is both logically and legally relevant to prove the charged crime, it is admissible. *Id.* Evidence is logically relevant if it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial. *Id.* Evidence is legally relevant if

its probative value outweighs its prejudicial effect. *Id.* Evidence of prior uncharged misconduct generally has a legitimate tendency to prove the specific crime charged when its tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan, or the identity of the person charged with the commission of the crime on trial. *Id.* This list of exceptions is not exhaustive. *Bernard,* 849 S.W.2d at 13.

### III.

Appellant asserts that the trial court erred in overruling appellant's objections to testimony and a videotape depicting sexual practices of appellant and his former girlfriend, Shirley Niswonger (mother of Candy Sisk), in which the two engaged in various consensual acts of bondage, anal sex, oral sex, and the use of sex toys.

Niswonger testified that she had once had a sexual relationship with appellant. She testified that the relationship involved appellant's tying her with her hands apart, her legs apart, her hands over her head, and her hands in front of her. Appellant tied her with rope and panty hose. Appellant anally penetrated Niswonger, with both a dildo and his penis. Niswonger stated that appellant made a videotape of their activity. During Niswonger's testimony, the prosecutor played an excerpt of the videotape. The excerpt shows in the foreground a closeup of the genital and anal area of Niswonger with Niswonger and appellant engaging in most of the sexual activities described by Niswonger in her testimony. The acts of tying Niswonger are visible, but not the central focus of the camera.

■ Appellant asserts that the trial court improperly admitted Niswonger's testimony and the videotape under the signature *modus operandi* /corroboration exception to the general rule prohibiting admission of prior uncharged misconduct evidence. In *Bernard,* this Court outlined the signature *modus operandi* /corroboration exception. *Bernard,* 849 S.W.2d at

17. The signature *modus operandi* /corroboration exception approximates the long established exception that allows for the admission of prior uncharged misconduct evidence to prove the identity of the wrongdoer. *Id.* Under the signature *modus operandi* /corroboration exception, a trial court has discretion to admit evidence of an uncharged crime when the charged and uncharged crime are "nearly 'identical' and their methodology 'so unusual and distinctive' that they resemble a 'signature' of the defendant's involvement in both crimes." *Id.* In *Bernard,* this Court held that evidence of prior uncharged misconduct is inadmissible solely for the purpose of proving that the defendant has a propensity to engage in deviant sexual behavior. *Bernard,* 849 S.W.2d at 16.

■ Because appellant failed to present his objection to Niswonger's testimony in his motion for a new trial, review is for plain error. *State v. Winfield,* 5 S.W.3d 505, 511 (Mo. banc 1999), *cert. denied,* 528 U.S. 1130, 120 S.Ct. 967, 145 L.Ed.2d 838 (2000); Rule 30.20. To be entitled to relief under a plain error standard of review, appellant must show that the trial court's error so substantially affected his rights that manifest injustice will occur if the error is left uncorrected. *Winfield,* 5 S.W.3d at 516. The state does not dispute appellant's assertion that Niswonger's testimony was prior uncharged misconduct evidence improperly admitted under the signature *modus operandi* /corroboration exception. The state asserts that the improper admission of Niswonger's testimony was harmless.

■ The state likewise does not dispute appellant's assertion that admission of the videotape excerpt showing Niswonger and appellant engaging in various acts of consensual sex was improper under the signature *modus operandi* /corroboration exception in *Bernard.* The state asserts that the error was harmless. The state also asserts, however, that the video excerpt was properly admitted in that it shows

appellant binding Niswonger with half-hitch knots, knots of the same type with which the victims were bound. The state contends that the admissibility of this "knot" evidence should be judged under general principles of relevance because the tying of a knot is not misconduct or a wrongful act. The state asserts that the similarity of knots tended to show that appellant was the person who committed the murders. In the alternative, the state asserts that the "knot" evidence was properly admitted under the rules governing admission of prior uncharged misconduct evidence.

The state does not explain how the excerpt of the video can be at once admissible and inadmissible. Even assuming that is the case, the excerpt was improperly admitted because the state laid no foundation for admission of the "knot" evidence. Nothing whatsoever was said about the knots the first time the video was played, immediately after Shirley Niswonger's testimony. The record reflects that there is no testimony anywhere in the trial from any witness regarding the type of knots or the manner in which they were tied. The prosecutor simply asserted in his guilt-phase closing argument, playing the tape for a second time, that the knots used to bind Niswonger were identical to those used to bind the victims. The prosecutor attempted to compare the video excerpt to certain photographs of the victims. The prosecutor stated:

> If you will watch the tying of the wrists of Shirley Niswonger, around the wrists. A couple of half inches, back over the other wrists, around the wrist, a couple of half inches. The wrists are apart. There goes another half inch and the third half inch and the fourth half inch. Stop the tape. You can look at these ropes, these bindings on the victims in the photographs. State's Exhibit 194, the ankles of Irene, you can see the half

inches. State's Exhibit 212, another photograph, bindings around Irene's ankles, half inches.[1]

The so called "knot" evidence, therefore, is nothing more than a replay of the video a second time before the jury, with the prosecutor himself vouching for the alleged similarity of the knots. The video excerpt, therefore, was not admissible in any respect.

## IV.

Appellant asserts that the trial court prejudicially erred in admitting into evidence a photograph of the cover of a magazine found in his residence. Appellant contends that the magazine cover is prior uncharged misconduct evidence, which fails to satisfy the requirements for admission under the signature *modus operandi* /corroboration exception. The cover of the magazine, called *Bondage Fantasies,* depicts a cartoon of a partially clothed woman bound to a tree with her hands tied and genitals exposed. The woman is held by one man while another man approaches her with his penis erect.

The state does not dispute appellant's contention that the magazine cover is prior uncharged misconduct evidence improperly admitted under the signature *modus operandi* /corroboration exception in *Bernard.* The state again contends that the admission of the evidence was not prejudicial.

## V.

Appellant contends that the trial court committed prejudicial error in admitting a red duffel bag containing dildos, as well as a photograph of the duffel bag and its contents.[2] Appellant asserts that these items constitute improperly admitted prior uncharged misconduct evidence. Appellant asserts that the duffel bag, the dildos, and the photograph were not relevant to

---

**1.** It appears that the word "half-hitch" was incorrectly transcribed as "half inch."

**2.** The red duffel bag also contained ropes, the admissibility of which appellant does not challenge.

establish any element of the charged crime, and that the state sought to admit this evidence for the improper purposes of establishing his bad character and his sexual perversion. Appellant asserts that the admission of the dildos was particularly prejudicial since the prosecutor referred to a "big dildo" in his closing argument to rebut appellant's counsel's argument that appellant had ropes in the bag because he was a roofer.

The state is silent with respect to appellant's assertion that the photograph of the red duffel bag and its contents was improperly admitted. This Court assumes the state agrees with appellant. Likewise, the state does not dispute that the red duffel bag itself was improperly admitted.

■ The state does respond to appellant's contention that the admission of the dildos themselves was error. The state argues that the dildos do not constitute prior uncharged misconduct evidence, and that the question of their admissibility should be decided under general principles of logical and legal relevance. The state contends that the dildos were properly admitted to corroborate appellant's guilt in that victim Candy Sisk was anally penetrated with an object at or after her death. In the alternative, the state asserts that the dildos were properly admitted under the rules governing admission of prior uncharged misconduct evidence.

The dildos were improperly admitted. The dildos should not have been admitted under the signature *modus operandi* /corroboration exception because there was no evidence that Candy Sisk was penetrated with a dildo, let alone one "identical" to those admitted. In addition, the fact that appellant possessed dildos is not "so unusual and distinctive" as to resemble his "signature" in the charged crimes.

■ Likewise, the dildos were improperly admitted under general principles of relevance. Even assuming *arguendo* that the dildos are logically relevant, they should not have been admitted because their prejudicial effect substantially outweighs their probative value when there was no evidence that Candy Sisk was penetrated with any of the admitted dildos or with any dildo. The admission of the dildos in this case resembles the improper admission of evidence in *State v. Kitson,* 817 S.W.2d 594 (Mo.App.1991), in which the defendant was charged with sodomizing his son. It was alleged that the defendant inserted his penis and a hot dog into his son's anus and had his son reciprocate the acts. *Id.* at 599. In *Kitson,* the court of appeals ordered a new trial because of the prejudicial error of the trial court in admitting evidence that the defendant frequently asked his wife to engage in anal sex and inserted glass tubing into his own anus and into his wife's vagina.[3] *Id.* The court held that the evidence was improperly admitted because any probative value of the evidence was substantially outweighed by the evidence's prejudicial effect. *Id.* at 599. Similarly, in the instant case, admitting the dildos was improper because the prejudicial effect of this evidence substantially outweighed its probative value, especially given that appellant was charged with murder, not with a sex crime involving the use of inanimate objects.

## VI.

Appellant asserts that the trial court improperly admitted a photograph of the labels on two videotapes labeled "Homemade Sex" and "May 7th 1995 (For Us

---

**3.** In *Kitson,* the court of appeals held that the evidence of consensual sexual acts between the defendant and his wife should be treated as evidence of prior uncharged misconduct because "[i]n the eyes of the jury, noncriminal conduct may work as much prejudice as criminal conduct." *Kitson,* 817 S.W.2d at 598. Because neither party has fully briefed the issue, this Court declines to decide whether *Kitson* should be extended to cover the dildo evidence and other evidence of consensual sex in this case. This Court notes only that *Kitson* could have been decided under general principles of relevance, with the evidence being excluded because of its lack of legal relevance.

Only) (Shirley 0 to 1159) (Rose 1159 to 1210) (Rose 1210 to End)" that were found in appellant's residence. Appellant asserts that the photograph of the tape labels is improperly admitted prior uncharged misconduct evidence. Appellant contends that the photograph of the tape labels was not relevant to establish any element of the charged crimes, and that the state introduced the photograph for the improper purpose of seeking to convict appellant on the grounds of bad character and sexual perversion.

The state does not dispute appellant's assertion that the photograph is improperly admitted prior uncharged misconduct evidence. Again, the state contends there was no prejudice.

## VII.

■ Appellant contends that the trial court committed prejudicial error in allowing Shirley Niswonger to testify that appellant once told Niswonger that he would take her son into the woods and shoot him. Appellant asserts that the threat is improperly admitted prior uncharged misconduct evidence. Appellant contends that Niswonger's testimony was not logically relevant, was improperly used to establish appellant's bad character, and was particularly prejudicial in the context of appellant's first degree murder trial since it involved a death threat. Because appellant made a late objection to Niswonger's testimony, review is for plain error. *State v. Holloway*, 992 S.W.2d 886, 892 (Mo.App. 1999).

In response, the state does not challenge appellant's assertion that the threat is prior uncharged misconduct. The state asserts, however, that Niswonger's testimony was properly admitted under the motive exception to the rule prohibiting admission of prior uncharged misconduct evidence. The state contends that Niswonger's testimony, along with evidence that Niswonger had ended her relationship with appellant several months before the murders, was both logically and legally relevant to establish appellant's animus toward Niswonger and, thus, motive for the murders. The state asserts that appellant killed Irene Sisk and Candy Sisk in a gruesome fashion to say "go to hell Shirley [Niswonger]." The state relies upon *State v. Stewart*, 18 S.W.3d 75 (Mo.App. 2000), in support of its argument.

■ Niswonger's testimony was not legally relevant to prove appellant's motive. *Stewart*, cited by the state, is distinguishable. In *Stewart*, the defendant threatened both his victim and the victim's mother. *Stewart*, 18 S.W.3d at 86. In the present case, there is no allegation that appellant threatened Candy Sisk or Irene Sisk. Nor is there evidence that appellant threatened Candy's mother, Niswonger. The prejudicial effect of Niswonger's testimony substantially outweighs its probative value in that it may have led the jury to convict appellant on propensity evidence. The trial court erred in admitting the evidence.

## VIII.

■ Appellant's final assertion relating to uncharged misconduct evidence is that the trial court erroneously admitted into evidence both a purple Crown Royal bag containing handcuffs and a photograph of the bag and its contents. Appellant also attacks the trial court's admission of a note found in his residence that reads "things for first entrance gun (back), handcuffs (pocket), 12 ft of rope (legs) in two 6 ft pieces," as well as a photograph of the note. Appellant asserts that the bag, the handcuffs, the note, and both photographs constitute improperly admitted prior uncharged misconduct evidence. Appellant asserts that there is no evidence that he owned a gun or that a gun was used in the crimes, and that there is likewise no evidence that handcuffs or a twelve foot rope cut into two pieces were used in the crime. Appellant contends that he was prejudiced by the admission of the bag, the handcuffs, the note, and both photographs because the jury was led to believe that appellant

intended to commit crimes other than those charged.

The state does not challenge appellant's assertion that the photographs are improperly admitted prior uncharged misconduct evidence. The state asserts, however, that the admissibility of the bag, the handcuffs, and the note should be judged under general principles of relevance since mere possession of a bag, handcuffs, and a note is not an uncharged crime, bad act, or evidence of crimes other than those charged.

■■■■ This Court agrees with the state that the admissibility of the bag, the handcuffs, and the note should be decided under general principles of relevance. Under general principles of logical relevance and legal relevance, the Crown Royal purple bag, the handcuffs, and the note were properly admitted to establish appellant's guilt of the charged crimes. These items of evidence tend to establish appellant's guilt in that the note, along with two other notes found at appellant's home, one listing directions to the victims' home and the other containing the name "Candace" and an indication that she lived in Gideon, constitute evidence that appellant planned to harm Irene Sisk and Candy Sisk, or at least Candy Sisk. The handcuffs and the purple Crown Royal bag tend to identify appellant as the killer since handcuffs are mentioned in the note found at appellant's residence and a purple Crown Royal bag was in appellant's possession before the crime. Finally, the probative value of these items greatly outweighs any prejudicial effect they may have had since these items directly relate to appellant's involvement in the murders. For the same reasons that the bag, the handcuffs, and the note were properly admitted, the photographs of these items were also properly admitted. A photograph is not inadmissible simply because other evidence of what is depicted in the photograph has been introduced. *State v. Rousan*, 961 S.W.2d 831, 844 (Mo. banc 1998). The trial court did not err in admitting the purple Crown Royal bag, the handcuffs, the note, or the photographs of these items.

## IX.

■■ A review of the evidence reveals that the trial court improperly admitted certain testimony and at least seven exhibits. It is undisputed by the state that the trial court erred in admitting Niswonger's testimony about consensual sexual activity between appellant and her, the portion of the two minute video excerpt showing appellant and Niswonger engaging in anal and other consensual sex, a photograph of the cover of a *Bondage Fantasies* magazine, the photograph of the labels of two videotapes clearly labeled as homemade sex tapes found in appellant's residence, the photograph of the red duffel bag and the dildos contained therein, and the red duffel bag itself. In addition, this Court has decided, *supra*, that the trial court erred in admitting the video excerpt showing appellant tying Niswonger with rope, in admitting the dildos found in the red duffel bag, and in allowing Niswonger to testify that appellant once threatened to take Niswonger's son into the woods and shoot him.

Finding that the trial court erred in admitting evidence does not end the inquiry. As the state points out, some error is harmless. With regard to the testimony and exhibits focusing on appellant's sexual proclivities, for example, the state asserts harmless error. The state argues that the evidence of appellant's sexual preferences was a miniscule part of the state's case and was not emphasized in the state's closing argument. The state's contention strains credulity. As will be discussed later, a large amount of graphic evidence regarding appellant's sexual proclivities was admitted and was highlighted throughout the trial. The state further asserts that improper admission of evidence of appellant's sexual proclivities was harmless error because the state inquired of the jury panel during voir dire concerning possible prejudicial effect of this sort of evidence, and no

venireperson indicated that he or she would be biased against appellant because of it. In light of the sheer volume of improperly admitted evidence, the graphic nature of this evidence, and the difference between merely hearing about the improperly admitted exhibits and actually seeing them, this Court cannot say that the venireperson's responses during voir dire indicate that the improper admission of evidence of appellant's sexual proclivities was harmless.

■ The state also asserts that, even if harmful error resulted from the improper admission of evidence, the evidence of appellant's guilt is so overwhelming that the conviction must be affirmed.

■ This Court declines to utilize so narrow a test. As noted in *State v. Roberts,* 948 S.W.2d 577 (Mo. banc 1997), *cert. denied,* 522 U.S. 1056, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998), the test is whether the prejudicial improper admission was outcome-determinative. *Id.* at 592. There is a distinction between evidence-specific and outcome-determinative prejudice. *Id.* When the prejudice resulting from the improper admission of evidence is only evidence-specific *and the evidence of guilt is otherwise overwhelming,* reversal is not required. *Id.* In contrast, when the prejudice resulting from the improper admission of evidence is outcome-determinative, reversal is required. *Id.* A finding of outcome-determinative prejudice "expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." *Id.*

■ Edward J. Imwinkelried, in *Uncharged Misconduct Evidence* section 9.85 (rev. ed.1999), cites a number of factors that courts consider when evaluating the significance of improperly admitted prior uncharged misconduct evidence. The factors also apply to evidence that was improperly admitted under general principles of relevance. Some of the factors are relevant to the present case. Their applications are of assistance in deciding whether the erroneously admitted evidence resulted in outcome-determinative prejudice, as defined in *Roberts.*

One factor is the similarity of the charged offenses to the improperly admitted evidence. Imwinkelried sec. 9.85. The jury is more likely to attach significant probative value to the improperly admitted evidence if it relates directly to the charged offenses. Imwinkelried sec. 9.85. In this case, much of the improperly admitted evidence relates directly to the charged offenses. The evidence of appellant's death threat to Niswonger's son resembled the charged crimes—murder—and the murders were of two individuals related to Niswonger. Much of the other erroneously admitted evidence relates to the surrounding circumstances of the murders. The prosecution alleged that appellant bound and stabbed both victims, and that appellant used a blunt object to penetrate Candy Sisk's anus at or after the time of her death. Shirley Niswonger's testimony regarding consensual anal sex and bondage with appellant related to the state's allegations that appellant bound both victims and anally assaulted Candy Sisk at or after the time of her death. The video excerpt of Niswonger and appellant engaging in consensual anal sex, bondage, and the use of sex toys also related to the state's allegations that appellant bound both victims and anally assaulted Candy Sisk at or after the time of her death. The magazine cover depicting a bound woman with exposed genitals being approached by a man with his penis erect may have been particularly compelling to the jury; both victims in this case were bound, and one victim was sexually violated. Evidence of appellant's homemade sex tapes may also have been especially probative in the eyes of the jury; the charged offenses involved anal penetration of Candy Sisk. It is also

probable that the jury would have attached significant probative value to the erroneously admitted dildos; Candy Sisk was penetrated with an object at or after her death. Further, because the trial court provided no limiting instruction about the use of the improperly admitted evidence, this Court's confidence that the jury did not misuse the evidence to convict appellant because of his bad character, sexual proclivities, or perversions is diminished.

The amount of evidence that was erroneously admitted and the extent to which the evidence was referred during the trial is another consideration. Imwinkelried sec. 9.85. The trial court in this case improperly admitted Niswonger's testimony about consensual sex with appellant and erroneously admitted a number of exhibits: the video excerpt, the photograph of the *Bondage Fantasies* magazine cover, the photograph of the labels on appellant's homemade sex tapes, the photograph of the red duffel bag and the dildos contained therein, the duffel bag itself, and some thirty dildos. In addition, the trial court erroneously admitted Niswonger's testimony about appellant's death threat to her son. The sheer volume of the erroneously admitted evidence weighs in favor of a finding that the erroneous admission of evidence in this case is reversible, outcome-determinative prejudice.

Whether the erroneously admitted evidence was highlighted throughout the trial is another question to consider. *See* Imwinkelried sec. 9.85. In this case, the factor weighs in favor of a finding that the prejudicial admission of the evidence constitutes reversible, outcome-determinative prejudice. In his guilt-phase closing argument, the prosecutor recounted all of the improperly admitted evidence, except for the death threat to Niswonger's son. He highlighted the evidence through several particularly egregious remarks. For example, in referring to the "knot" evidence in his guilt-phase closing argument, the prosecutor stated, "Who typed [sic] knots similar to those found on the victims? Cecil Barriner, the defendant," and "Who ties the same type of bondage knots, who ties them at rapid speed?" The prosecutor ridiculed appellant's counsel's argument that defendant possessed a red duffel bag with ropes because he was a roofer. The prosecutor improperly referred to the dildos found in the red duffel bag by stating, "[i]s that for roofing, in a duffel bag so he can go places with a big dildo in it, okay— that's cause he's a roofer. Whose case is disingenuous?" Because of the volume of testimony devoted to the improperly admitted evidence, as well as the number of references highlighting the improperly admitted evidence, the likelihood that this evidence had a lasting impact on the jury is great.

Furthermore, the prosecutor's elicitation of the evidence that was erroneously admitted was not inadvertent. *See* Imwinkelried sec. 9.85. The prosecutor deliberately adduced the evidence. He argued vigorously to the trial court in response to motions in limine filed by appellant in advance of trial that the evidence was relevant, both logically and legally.

Despite the volume and nature of the erroneously admitted evidence and the likelihood that the jury would have found a substantial amount of it probative, the state contends that overwhelming evidence of appellant's guilt cures all. This Court does not agree. There is no doubt that the state made a submissible case. The question is not, however, whether the state made a submissible case, but whether the prejudice resulting from improper admission of evidence is outcome-determinative, requiring reversal. Put another way, the question is whether the evidence had an effect on the jury's deliberations to the point that it contributed to the result reached. Even if reasonable minds may differ with respect to whether there is overwhelming evidence of guilt in this case,[4] that is not the only consideration.

---

4. This is not an easy call in this case. The state points to fifteen items that it says consti-

This Court cannot say that the inadmissible evidence did not contribute to the jury's verdict.

The state relies on *Roberts; State v. McClanahan*, 954 S.W.2d 476, 480 (Mo. App.1997); *State v. Rush*, 949 S.W.2d 251, 256 (Mo.App.1997); and *State v. Troupe*, 863 S.W.2d 633, 636–37 (Mo.App.1993).

In *Roberts*, the defendant was convicted of first degree murder and sentenced to death for beating his fifty-six year old female neighbor to death with a hammer. *Id.* at 585. Before this Court, the defendant argued that his sentence and conviction should be reversed because of the trial court's error in improperly admitting evidence of his prior uncharged misconduct. *Id.* at 590. Specifically, the defendant asserted that he was prejudiced by the trial court's admission of evidence that the defendant drove at excessive speed, stole license plates from cars at a mall, and burglarized a car dealership prior to killing the victim. *Id.* This Court agreed that the trial court improperly admitted evidence of prior uncharged crimes by the defendant. *Id.* at 590–92. This Court went on to note, however, that the defendant's conviction and sentence should be upheld because no outcome-determinative prejudice had resulted from the improper admission of the uncharged crimes evidence. *Id.* at 592. In reaching the conclusion that no outcome-determinative prejudice resulted, this Court noted that the improperly admitted evidence of other crimes concerned activities unrelated to the charged crimes. *Id.* at 585. This Court also noted, importantly, that "the evidence that [the defendant] killed [the victim]—even if one discounts his confession totally—is overwhelming and virtually uncontroverted." *Id.* at 585–86.

Contrary to the state's assertions, this case is not like *Roberts*. As noted *supra*, in *Roberts*, the improperly admitted evidence was unrelated to the charged crime, and the evidence of the defendant's guilt—even setting aside his confession—was overwhelming and essentially uncontroverted. In this case, in contrast, the improperly admitted evidence relates to the charged crimes. In fact, the state acknowledges that a number of items of evidence were improperly admitted to show the defendant's sexual propensities and perversions and thereby establish that the defendant committed the charged crimes. Furthermore, in this case, this Court cannot say, temporarily setting aside appellant's confession, that the evidence of appellant's guilt is otherwise overwhelming and essentially uncontroverted.

*McClanahan, Rush, and Troupe* are distinguishable. In *McClanahan*, the prosecutor on cross-examination questioned the defendant about prior uncharged misconduct. *McClanahan*, 954 S.W.2d at 479. The court of appeals expressly noted that the defendant was not asked about prior uncharged misconduct involving the same crimes for which she was on trial, and that the prosecuting attorney never referred to the improperly admitted testimony during the trial. *Id.* at 480. In this case, the improperly admitted evidence was referred to during trial and related to the same type of crimes for which appellant was on trial. In *Rush*, the court held that the prior uncharged misconduct evidence was properly admitted under *Bernard*. *Rush*, 949 S.W.2d at 254–55. Any reference by the court to the prejudicial effect of an improper admission is, therefore, merely dicta. In *Troupe*, the court of

---

tute overwhelming evidence of guilt. There was blood trace and other evidence of appellant's guilt, and appellant confessed. A thorough review of the record, however, reveals that appellant vigorously contested, and in some instances defeated, the state's blood evidence. Appellant also attempted to raise a reasonable doubt in the minds of the jury with regard to the voluntariness of his confession,

as well as the validity of it, on the basis that the confession contained very little detail and was not videotaped. Much of the other evidence to which the state points either should not have been admitted or is consistent with appellant's defense that he visited the victims, went to the bank with them, borrowed money from them, and then left without harming them.

appeals explicitly noted that there was no question of identification of the defendant, and that the state's evidence was undisputed. *Troupe*, 863 S.W.2d at 636.

In sum, looking at the record as a whole, this Court cannot say that the admission of the evidence at issue did not result in outcome-determinative prejudice, requiring reversal.

## X.

The judgment is reversed, and the cause is remanded for a new trial.

WHITE, HOLSTEIN, WOLFF and BENTON, JJ., concur;

PRICE, C.J., concurs in part and dissents in part in separate opinion filed; LIMBAUGH, J., dissents in separate opinion filed.

PRICE, Chief Justice, concurring in part and dissenting in part.

I concur in part and dissent in part from the majority opinion.

As to the judgment of the trial court concerning the guilt of Cecil Barriner, I dissent. I agree with Judge Limbaugh that considering the strength of the other properly admitted evidence, the admission of the videotape evidence was not prejudicial. I am confident that Barriner would have been found guilty, regardless.

I am not confident, however, that the videotape evidence did not inflame the jury to the extent that the death penalty was assessed improperly under the influence of undue passion and prejudice. Accordingly, I feel compelled to reverse the judgment as to the imposition of the death penalty in accordance with the requirements of section 565.035.3(1) and would remand for a new trial as to penalty.

LIMBAUGH, Justice, dissenting.

I respectfully dissent.

For the most part, I agree with the majority's determination that certain evidence should have been excluded. In particular, I agree that the seedy, pornographic evidence of defendant's sexual proclivities was more prejudicial than probative and for that reason was inadmissible, at least in the guilt phase.

My only disagreement regarding evidence that should have been excluded pertains to certain testimony by Ms. Niswonger, the mother of one of the victims. Defendant had told Ms. Niswonger after an altercation between them that "he was going to go and get [her] son and take him to the woods and kill him." This threat, although directed to Ms. Niswonger's son, is some evidence of defendant's motive to murder Ms. Niswonger's daughter. It gives rise to a reasonable inference that he murdered the daughter in part because he was angry with Ms. Niswonger and wanted to get back at her. Evidence of uncharged misconduct to establish motive is a well-recognized exception to the general rule. *State v. Roberts*, 948 S.W.2d 577, 591 (Mo. banc 1997). This exception, like the other major exceptions (intent, absence of mistake or accident, common scheme, and identity) is based on the recognition that the probative value of this category of evidence presumptively outweighs the prejudicial effect. *Id.* Although the prejudicial effect of the evidence must still be considered to determine if the presumption is overcome, in this case, the presumption should hold. Defendant's threat, in the larger sense, was that he would kill one of Ms. Niswonger's children in order to punish Ms. Niswonger, herself. The fact that he carried out his threat, albeit on a different family member, is proof that the probative value measured up to the prejudicial effect. Furthermore, in a very real sense, the threat is not propensity evidence at all, but a threat to commit the crime that was actually consummated.

In general, our appellate review on this and all evidentiary issues is limited to the determination of whether the trial court abused its discretion. *State v. Wolfe*, 13 S.W.3d 248, 258 (Mo. banc 2000). In that regard, the majority fails to give due deference to the trial court's weighing of pro-

bative value versus prejudicial effect. Of more concern is the fact that defendant did not properly object to the admission of this purported propensity evidence so that the applicable standard of review is not abuse of discretion, but plain error giving rise to manifest injustice. Rule 84.13(c). Regrettably, the majority pays no heed to these standards. I would hold that the admission of defendant's threat was not error, much less plain error.

Turning to the issue of defendant's sexual proclivities, I would hold that the fact that the prejudicial effect of the evidence outweighed its probative value did not constitute outcome-determinative prejudice requiring reversal, because the properly admitted evidence of guilt was overwhelming. As this Court explained in *Roberts*, in addressing the improper admission of uncharged misconduct: "This outcome-determinative prejudice is different from the prejudice a trial court considers when it weighs the probative value of a piece of evidence against its potential for prejudice. This latter prejudice is evidence-specific." *Roberts*, 948 S.W.2d at 592.

I am confused by the majority's discussion of the standards to be used in determining whether improper admission of the evidence is reversible error. The opinion states: "[T]he question is ... whether the prejudice resulting from improper admission of evidence is outcome-determinative, requiring reversal. Put another way, the question is whether the evidence had an effect on the jury's deliberations to the point that it contributed to the result reached." These two sentences are patently inconsistent. The first provides, according to the majority's citation to *State v. Roberts* earlier in the opinion, that reversal is required if the jury would not have found the defendant guilty "but for the erroneously admitted evidence." The second provides, without any citation to authority, that reversal is required if the erroneously admitted evidence contributed to the verdict of guilt. Evidence that merely contributed to the verdict is not necessarily outcome-determinative, so I do not understand how the two sentences are equated. Furthermore, the standard that reversal is required when inadmissible evidence "contributed to the result reached," combined with the fact that all the evidence supporting the verdict contributes to the result reached, leads to the rather absurd consequence that reversal is required in every case.

Despite my confusion, I assume that the majority is not attempting to transform the standard of review for prejudicial error and that this Court still abides by the outcome-determinative standard. But, even then, there is still some concern. In response to the state's recitation of the long-held premise that even if harmful error resulted from the improper admission of evidence, the evidence of guilt may be so overwhelming that the conviction must be affirmed, the majority states, "[t]his Court declines to utilize so narrow a test." The majority then holds that the test to be used "is whether the prejudicial improper admission was outcome-determinative," as if the test was hopelessly in conflict with the state's reference to overwhelming evidence. To say that the evidence of guilt was so overwhelming that other evidence improperly admitted does not require reversal is simply to say that the evidence improperly admitted was not so prejudicial that it was *outcome-determinative*. Consideration of overwhelming evidence of guilt is simply a logical application of the outcome-determinative test. It is admissible evidence that precludes the inadmissible evidence from being outcome-determinative. Though the majority asserts that overwhelming evidence of guilt should not be the *controlling* element of the outcome-determinative standard, *State v. Roberts*, the case on which the majority repeatedly relies, supports the opposite conclusion. *Roberts* held that the erroneous admission of defendant's uncharged misconduct resulted only in "evidence-specific prejudice, not outcome-determinative prejudice" and

that defendant's guilt "is essentially uncontroverted and overwhelming." *Id.*

Using the analysis outlined in *Roberts*, I submit that the prejudice in admitting evidence of defendant's sexual proclivities was evidence-specific and not outcome-determinative. It was not outcome-determinative because it cannot fairly be said that the jury would have reached a different conclusion "but for the erroneously admitted evidence." The jury would not have reached a different conclusion because the properly admitted evidence of guilt was overwhelming. The list of 15 factors taken from the state's brief proves the point:

1. Appellant's confession that he murdered the Sisks;

2. Evidence directly corroborating factual details in appellant's confession, including the bank teller who cashed a check for a man in the company of Candy Sisk and driving a car identical in make, model and color to that driven by appellant, and the partially filled-out check found at the murder scene;

3. Appellant's statement that his motive for going to the Sisks' residence was to take money, corroborated by the evidence above and by the fact that the victims' purses had been ransacked;

4. Evidence suggesting that animus against Shirley Niswonger, Candy's mother, may have been a possible motive for murdering the Sisks, including the fact that Niswonger had told appellant several months before the murder that she wanted to break up with appellant and the fact that appellant had previously threatened the life of Niswonger's children and

5. The fact that appellant had made repeated attempts to visit the Sisks the day before the murder, and his statement to Samantha Simmons that he was going there to get money from "the girl" at the Sisk residence;

6. The fact that a car fitting the description of the one driven by appellant was seen driving slowly in front of the Sisk residence less than three hours before the victims' bodies were discovered;

7. The fact that the man who came to the Sisk house a short time later told Irene Sisk that he had "a Christmas gift for Candy from her mother in jail," given that appellant was acquainted with Candy and had personal knowledge that her mother was incarcerated;

8. The fact that this man drove a car of the same make, model and color as that driven by appellant;

9. The presence of a number of blood spots and traces on the automobile that had been driven by appellant and that was found at appellant's residence, and the fact that one of these blood samples was matched by DNA analysis with the blood of Irene Sisk;

10. The fact that a microscopic analysis of the numerous ropes found at appellant's residence established that two of them were consistent in color, composition and construction with the ropes that had been used to bind the victims;

11. The fact that a complex knot used to bind the murder victims was similar to the one tied by appellant on a previous occasion;

12. The discovery of notes in appellant's room listing the name "Candace," giving directions to the Sisk house, and describing preparations to be made for entry, including a gun, handcuffs and a rope, corroborated by appellant's possession of handcuffs and rope and the use of rope to bind the victims;

13. The fact that appellant told a friend the day before the murder that he had no money, contrasted with his multiple expenditures beginning only a few hours after the killings;

14. Appellant's display of a consciousness of guilt by checking into a motel, instead of going to his home in the same city, a short time after the murders, and his telling of multiple inconsistent stories when questioned by police;

15. Appellant's possession or disposition shortly after the murders of numerous items that were consistent with having been fruits or instrumentalities of the

crime, including a VCR, telephones, a videotape of "Independence Day," [and ropes].

In a footnote, the majority unfairly discounts this evidence in an attempt to show that it was not overwhelming. Although there was controversy over the blood evidence at trial, defendant did not renew the controversy on appeal, which is a tacit concession that the evidence was relevant, that it was based on established scientific principles, and that it was otherwise admissible. Defendant's so-called challenge to the voluntariness and validity of his confession is even more spurious. The extensive trial testimony by the officers who interviewed defendant was uncontroverted. Defendant did not take the witness stand, and defense counsel's questions on cross-examination of the officers attempting to suggest that the confession was involuntary or invalid were all refuted. In addition, the majority's observation that the confession "contained very little detail and was not videotaped" was of so little consequence that not even the defendant, himself, raised the point on this appeal. On the next point, the majority fails to identify the evidence of guilt from the above list that supposedly should not have been admitted, other than the uncharged misconduct evidence, and I have found none. There is also the assertion that much of the other evidence of guilt "is consistent with [his] defense that he visited the victims, went to the bank with them, borrowed money from them, and then left without harming them." Suffice it to say that this evidence is far more inculpatory than exculpatory. In sum, these points do not alter my belief that the evidence of guilt was overwhelming and that the prejudice caused by admission of the evidence of uncharged misconduct was not outcome-determinative.

The penalty phase is a completely different matter. "Other crimes" evidence, or evidence of a defendant's prior uncharged misconduct, and all other evidence pertaining to a defendant's character is admissible in penalty phase. *State v. Kreutzer*, 928 S.W.2d 854, 874 (Mo. banc 1996), *cert. denied*, 519 U.S. 1083, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997). Evidence of a defendant's extreme sexual proclivities or sexual perversion, which some would say is not necessarily a character flaw if engaged in through consensual relations, is most certainly a character flaw when coupled with other evidence showing that the perversion can manifest in criminal behavior. In this case, the evidence of defendant's character flaw of sexual perversion should have been admissible in penalty phase because it manifested in the criminal conduct of binding and anally sodomizing one of the victims in the course of the murder. Indeed, admission of the evidence is all the more appropriate because the binding and anally sodomizing of one of the victims was one of the aggravating circumstances of the murder—that the murder was "outrageously and wantonly vile, horrible, and inhuman." To reiterate, evidence of such a high degree of sexual perversion that it manifests in criminal behavior is evidence of the defendant's bad character of which the jury should be apprised in making the sentencing determination.

For these reasons, I would affirm the judgment of conviction and sentence.