

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | **WD82085** |
| v. | ) | |
| | ) | |
| | ) | **OPINION FILED:** |
| CHERYL D. KELLY, | ) | **March 10, 2020** |
| | ) | |
| Appellant. | ) | |

### Appeal from the Circuit Court of Jackson County, Missouri
### The Honorable Joel P. Fahnestock, Judge

**Before Division One:** Thomas N. Chapman, Presiding Judge, and
Mark D. Pfeiffer and Anthony Rex Gabbert, Judges

Ms. Cheryl Kelly ("Kelly") appeals her convictions following a jury trial in the Circuit Court of Jackson County, Missouri ("trial court"), of two counts of making or causing to be made a false statement to receive a health care payment, section 191.905 RSMo, and one count of financial exploitation of the elderly, section 570.145 RSMo. On appeal, Kelly claims instructional and evidentiary errors. We affirm.

### Factual and Procedural History[1]

In 2013 and 2014, Kelly was employed by two healthcare companies—Another Day Companies and Cascade Health Services. Another Day Companies provided home healthcare

---

[1] "This Court reviews the evidence presented at a criminal trial in the light most favorable to the verdict." *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009).

services, such as assisting elderly clients with cognitive difficulties with home tasks such as home cleaning, cooking meals, dressing, transporting clients to doctor's appointments, and assisting clients with prescription medications. Cascade Health Services provided replacement staff for hospitals and nursing homes. Kelly was assigned to be a home health aide to two elderly clients, H.B. and H.C.,[2] both of whom had cognitive issues that prevented their ability to provide independently for themselves.

Both healthcare companies provided representatives of the respective companies to testify at trial as to the training that Kelly received and the emphasis placed upon submitting accurate time sheets for services rendered, as those time sheets would be used to submit Medicaid claims relating to services for the Medicaid-eligible recipients and falsified time sheets would subject the company to Medicaid fraud claims. These same company representatives also testified to the extensive training that Kelly received about elder exploitation and the absolute prohibition of such. Kelly received training about abuse, neglect, her ethical obligations to the clients, and very importantly, that home healthcare aides were not to use the client's money "in any way, shape, or form." Kelly received specific training about financial exploitation—that she should not act as a client's financial power of attorney; that she should not be listed as a joint holder of a client's bank account; and that she should not accept any monetary gifts from clients.

Over the course of fifteen months in 2013 and 2014, Kelly intentionally falsified time sheets—double billing H.B. and H.C. by submitting time sheets to both of the healthcare companies she worked for (and getting paid "double" by the companies)—and Kelly financially exploited H.B. and used H.B.'s money to pay her mortgage, car insurance, and gambling debts.

---

[2] Though no statute requires it, we have chosen to refer to the elder-abuse victims by their initials to protect their privacy.

Kelly covered up her financial exploitation by having H.B. execute a power of attorney to her, and she was thus able to manipulate H.B.'s communications with doctors and family members.

At trial, the State of Missouri (the "State") presented overwhelming evidence of Kelly's scheme by way of meticulous testimony from Venise Wood, the Bureau Chief of Long-Term Services and Supports with the Division of Senior and Disability Services of the Missouri Department of Health and Senior Services; Denise Vaughn, an abuse, neglect, and elder exploitation investigator with the Department of Health and Senior Services; Chris Schneider, a supervisor field examiner with the Veterans Administration; Andrea Chadwick, a case manager at Research Medical Center; Kayetta Grant, a social worker at the Kansas City V.A. Medical Center; Lynn Forest Newheart, a social worker with the Kansas City V.A. Medical Center; JoAnn Subar, a former employee of an apartment complex where H.B. resided; Linda Bowling, the billing manager at the apartment complex where H.B. resided; Sharon Spencer-Drew, the Regulatory Compliance Manager for Harrah's North Kansas City Casino; Melinda Smithey, a compliance specialist with Ameristar Casino; David Rice, a compliance manager for Hollywood Casino at the Kansas Speedway; Karen Moore, the compliance manager for Argosy Casino; Claire Reppy, the business office director at Indian Creek Healthcare Center; Lorraine Dold, an employee of Another Day Companies; Dana Everts, the nursing manager for Another Day Companies; Jamie Philbert, program development specialist with the Missouri Department of Social Services in the Missouri Medicaid Department; Audra Ranes, an employee of Cascade Health Services; Jenny Denham, the staffing coordinator at Providence Medical Center; Matt Smith, Chief Investigative Auditor in the Medicaid Fraud Control Unit of the Missouri Attorney General's Office; Clara Brown, H.B.'s sister; and Linda McClellan, H.B.'s sister.

Through this testimony, the State presented evidence showing 168 times—encompassing hundreds of hours—in which Kelly had falsified time records to submit reimbursement for health care services she allegedly rendered to H.B. and H.C. wherein she would have had to be in two places at the same time.

Additionally, through this testimony, the State presented evidence which clearly demonstrated that Kelly obtained a power of attorney from H.B.; she then placed herself as a joint owner of his bank account; she then used H.B.'s bank account for her personal uses, including to pay her mortgage payment, paying her car insurance, and funding her gambling habits at numerous Kansas City casinos.

The State also presented testimony from H.B.'s family and investigators that H.B.'s apartment was filthy and unattended, that Kelly would misrepresent herself as a "daughter" or "niece" to healthcare providers, and that she was moving H.B. to different apartments to make it difficult and sometimes impossible for H.B.'s siblings to communicate with H.B.

The State charged Kelly with two counts of making a false statement to receive a health care payment, occurring May and July 2013, and one count of financial exploitation of the elderly, occurring on or between May 2013 and July 2014. The case proceeded to jury trial, and the jury found Kelly guilty of all three counts. She was sentenced to seven years' imprisonment on Count I, seven years' imprisonment on Count II, and eight years' imprisonment on Count III. The sentences were ordered to run concurrently. Execution of the sentences was suspended, and Kelly was placed on probation of five years.

This appeal follows.

4

**Point I – Claim of Instructional Error**

**Standard of Review**

In this case, the parties agree that there was not an applicable jury instruction mandated by the Missouri Approved Instructions—Criminal (MAI-CR). "The trial court is afforded the discretion to submit or refuse a proffered jury instruction that has not been mandated by the Missouri Approved Instructions—Criminal." *State v. Edwards*, 530 S.W.3d 593, 602 (Mo. App. E.D. 2017) (citing *State v. Bush*, 372 S.W.3d 65, 69 (Mo. App. W.D. 2012)). "Thus, this court's review is limited to whether the trial court abused that discretion." *Id.* (citing *State v. Durham*, 299 S.W.3d 316, 321 (Mo. App. W.D. 2009)).[3]

**Analysis**

Instruction No. 7 submitted to the jury in Kelly's trial stated in relevant part:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

. . . .

Second, the defendant caused a false representation of material fact to be made to the Missouri Department of Social Services about health care services provided to [H.C.] on or about May 16, 2013, and

. . . .

Fourth, that the defendant made the false representation of material fact in order to receive a health care payment . . . .

Instruction No. 9 submitted to the jury stated in relevant part:

As to Count II, if you find and believe from the evidence beyond a reasonable doubt:

. . . .

---

[3] This standard should not be conflated with the *de novo* standard of review required when a trial court refuses to give an approved or mandated criminal jury instruction. *State v. Bruner*, 541 S.W.3d 529, 534 (Mo. banc 2018) (citing *State v. Jackson*, 433 S.W.3d 390, 395 (Mo. banc 2014)); *see also* Rule 28.01(c), Mo. R. Crim. P. 2019 ("Whenever there is an MAI-CR instruction or verdict form applicable under the law and Notes on Use, the MAI-CR instruction or verdict form shall be given or used to the exclusion of any other instruction or verdict form.").

Second, the defendant caused a false representation of material fact to be made to the Missouri Department of Social Services about health care services provided to [H.B.] on or about July 9, 2013, and

. . . .

Fourth, that the defendant made the false representation of material fact in order to receive a health care payment . . . .

Instruction No. 14 submitted to the jury stated in relevant part:

The following terms used in these instructions are defined as follows:

. . . .

Material means if the representation might reasonably influence or has a natural tendency to influence the person to whom the representation was made to take a particular action or decline to take a particular action with regard to a Medicaid claim. The person to whom the representation is made need not be influenced by or rely upon the representation in order for the representation to be material.

The defense argued that the court should use the definition of "material fact" from the MAI for perjury. The defense's proposed definition read:

Material Fact. As used in these instructions a fact is material if it could substantially affect, or did substantially affect, the course or outcome of the cause, matter, or proceedings.

In her first point on appeal, Kelly claims the trial court erred when it rejected her definition of "material fact" and accepted the State's definition of "material." She argues the State's definition lowered the State's burden of proof and claims her proposed definition of "material fact" has already been approved by the Missouri legislature for the crime of perjury.

*State v. Barnes*, 942 S.W.2d 362 (Mo. banc 1997), is controlling on this claim of error. In *Barnes*, the defendant was convicted under section 287.128 for workers' compensation fraud. *Id.* at 364. The defendant claimed that the instructions given to the jury "were improper, because the definition of the term 'material,' as used in the instructions, (1) did not comply with the MAI-CR

6

3d definition, and (2) included an element of reliance." *Id*. at 368. The verdict director in *Barnes* stated:

> A representation is "material" if it might reasonably influence or has a natural tendency to influence the person to whom the representation was made to take a particular action or decline to take a particular action with regard to a workers' compensation claim. The person to whom the representation is made need not be influenced by or rely upon the representation in order for the representation to be material.

*Id*. This is the same definition submitted by the State in Kelly's trial below. Like here, both parties in *Barnes* agreed "that there was not an applicable MAI-CR 3d instruction for the criminal offense" at issue. *Id*. "The instructions that were approved by the court . . . were modeled on MAI-CR 3d 304.02, which is the generic verdict director form." *Id*.

Like here, Barnes argued that the parties should have used "the definition found in MAI-CR 3d 333.00, the definitions section." *Id*. That definition was for the phrase "'material fact' as it is used as an element of the offense of perjury under § 575.040.1." *Id*. That definition cites section 575.040.2 which "provides that a fact is material 'if it could substantially affect, or did substantially affect, the course or outcome of the cause, matter, or proceeding.'" *Id*. This is the definition Kelly proposed below and that was rejected by the trial court.

The *Barnes* court noted that the definition the trial court rejected may not have been inappropriate. *Id*. Despite that, the *Barnes* court concluded that the State offered a suitable definition that was relevant to the charged offense and that was not inconsistent with the definition in MAI-CR 3d 333.00. *Id*. Thus, the trial court did not err in accepting the State's definition. *Id*.

"Where . . . a challenged instruction is not found in MAI, the question is whether it follows the substantive law and can be readily understood." *Rice v. Bol*, 116 S.W.3d 599, 606 (Mo. App. W.D. 2003) (internal quotation marks omitted). As in *Barnes*, Kelly's proffered definition might not have been inappropriate, but that is not the question for this court. Instead, we look at the

7

instruction that was given and determine if it followed the substantive law and was easily understood. Since the trial court below used the *identical* not-in-MAI definitional instruction that our Missouri Supreme Court had previously approved in a very similar factual scenario, we certainly cannot say the trial court abused its discretion in submitting the *identical* instruction to the jury in Kelly's trial.

Point I is denied.

## Point II – Claim of Evidentiary Error

### Standard of Review

"Circuit courts retain wide discretion over issues of relevancy and admissibility of evidence." *State v. Prince*, 534 S.W.3d 813, 818 (Mo. banc 2017). "The circuit court's discretion will not be disturbed unless it is clearly against the logic of the circumstances." *Id.* (internal quotation marks omitted). "On direct appeal, this Court reviews the [circuit] court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.* (internal quotation marks omitted).

### Analysis

During the trial, Linda McClellan, H.B.'s sister, testified as follows:

Q: You mentioned you were visiting your other brother at some point. Is he still living?

A: No.

Q: And was there an incident with Ms. Kelly around his funeral?

. . . .

I apologize. You were telling me about an incident involving—now, you have two brothers; is that correct?

A: Yeah, [H.B] and my brother Robert.

8

Q: And about Robert's funeral?

A: Yes, we couldn't locate [H.B.] to have him come to the funeral with us. I was going to pick him up to take him to the funeral and [Kelly] just never called me back until—she called me back the day of and it was already after the funeral. No, I don't even know if she called me back, I think she sent me a text. I think that's what, this is where you can find your brother.

Q: Why didn't you just call your brother at that point?

A: I didn't know where he was and that was always a problem because once she came into his life, I couldn't—once she moved him away from his home phone, I couldn't find him. I always either had to go through her or somebody would call me and tell me he was in the hospital or something like that. I never knew where he was at. I never knew an address or anything like that until he was in the nursing home, that's when he got stable again. And prior to him meeting Ms. Kelly, he was always stable.

When Kelly's defense counsel objected to testimony about missing a funeral, the State argued that the testimony about the missed funeral was relevant to the isolation of H.B. and that Kelly concocted this scheme to take H.B.'s money. The trial court agreed and permitted the testimony. During closing argument, the prosecutor stated:

[Kelly] moved [H.B.] to hide him so nobody would check up on this. You heard a lot from his sisters about how before Ms. Kelly was in his life, they kept in contact. Yes, they lived out of state. And they would have loved for him to move up there, but he chose not to and that was his choice. But they kept in contact, they talked to him a couple times a week. They did come visit him when they could. After Ms. Kelly was involved, those phone calls stopped. There was a point in time where they didn't even know where to get ahold of him. He missed his brother's funeral because his sisters could not find him. And they asked Ms. Kelly to keep in touch. They had asked her to let them know what was going on and just to do the courtesy of returning their phone calls. And she didn't do that. She isolated [H.B.].

In her second point on appeal, Kelly claims the trial court abused its discretion in allowing H.B.'s sister to testify that Kelly caused H.B. to miss his brother's funeral. Kelly argues this evidence constituted "prior bad acts" and that the testimony was substantially more prejudicial

9

than probative. She further states that the testimony did not meet any of the exceptions allowing admission of "prior bad acts" evidence. We disagree.

"As a general rule, evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Barriner*, 34 S.W.3d 139, 144 (Mo. banc 2000) (internal quotation marks omitted). "When not properly related and logically relevant to the crime at issue, the introduction of other crimes evidence violates the defendant's right to be tried only for the offense for which he is charged." *Id*. (internal quotation marks omitted).

"If, however, evidence of prior misconduct is both logically and legally relevant to prove the charged crime, it is admissible." *Id*. "Evidence is logically relevant if it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial." *Id*. "Evidence is legally relevant if its probative value outweighs its prejudicial effect." *Id*. at 144-45.

The State's theory at trial with respect to Count III for financial exploitation was that Kelly isolated H.B. from his family as a part of her scheme to take his money. The State argued that Kelly did not want H.B.'s family or social workers to learn of her actions. With respect to Count II, the State argued that Kelly was not providing services to H.B. as she claimed. Part of the evidence to prove this involved H.B.'s family observing that his apartment was filthy to the point H.B.'s sister went to obtain cleaning supplies. The evidence at trial suggested Kelly knew H.B.'s sister's observation was problematic because Kelly quickly cleaned H.B.'s apartment before his sister returned with the cleaning supplies. Thus, Kelly had another motive to keep H.B. from his family.

"The standard of review affords great deference to the trial court's assessment of whether evidence is legally relevant." *State v. Clover*, 924 S.W.2d 853, 856 (Mo. banc 1996). When "[t]he propriety of the trial court's ruling is a close question," then the case "is decided as a matter of

10

deference to the trial court's superior position to consider and understand the circumstances within the trial." *Id*. "Evidence of prior uncharged misconduct generally has a legitimate tendency to prove the specific crime charged when it[] tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan, or the identity of the person charged with the commission of the crime on trial." *Barriner*, 34 S.W.3d at 145. The trial court did not abuse its discretion in concluding the evidence about H.B. missing his brother's funeral because his family could not locate him was relevant to establish Kelly's intent and scheme.

Point II is denied.[4]

**Conclusion**

The judgment is affirmed.

/s/ *Mark D. Pfeiffer*
Mark D. Pfeiffer, Judge

Thomas N. Chapman, Presiding Judge, and Anthony Rex Gabbert, Judge, concur.

---

[4] We also note that the evidence of Kelly's guilt at trial was overwhelming. On appeal, Kelly does not challenge the sufficiency of the evidence of her guilt. But, the evidence below was not just substantial—it was overwhelming. Given the overwhelming evidence of Kelly's guilt, there simply is no reasonable probability that the jury would have reached a different conclusion even were we to conclude that the trial court committed the instructional or evidentiary errors complained of on appeal—which we do not.

11