STATE of Missouri, Respondent,

v.

Charles B. KAISER, III, American Healthcare Management, Inc., and Claywest House Health Care, LLC, Appellants.

Nos. ED 82515, ED 82516, ED 82517.

Missouri Court of Appeals,
Eastern District,
Division Three.

April 6, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 7, 2004.

Application for Transfer Denied
Aug. 24, 2004.

James W. Erwin, St. Louis, MO, for appellants.

James G. Gregory, St. Charles, MO, for respondent.

LAWRENCE E. MOONEY, Judge.

Defendants Charles B. Kaiser III (Kaiser), American Healthcare Management, Inc. (AHM), and Claywest House Healthcare L.L.C. (Claywest), appeal from the judgment entered pursuant to jury verdicts, of convictions of class A misdemeanors of failing to report elder abuse under Section 565.188.[1] The court sentenced Kaiser to one year in jail and a fine of $1,000.00. The court fined AHM and Claywest $5,000.00 each. We affirm.

### Factual and Procedural Background

These convictions stem from the failure of the defendants to report the abuse of Marshall Rhodes, a 78–year–old resident of Claywest who was beaten and thereafter died. Claywest operates the nursing home where Rhodes was a resident, but had contracted with AHM to provide management services, including the hiring and supervision of the administrator. Kaiser was the president and in-house counsel of AHM, which manages Claywest and other nursing homes. During 1998 and 1999, the Missouri Division of Aging had inspected Claywest and discovered numerous life-threatening violations. These violations endangered Claywest's operational license and its Medicare and Medicaid certification. In fact, from December 1998 to February 1999, Claywest was operating under a temporary license through a consent agreement with the Division of Aging and

the Division had recommended a fine of $360,000 as a result of numerous violations of their standards.

AHM's employee handbook provided that instances of suspected abuse must be investigated by the administrator who would, after an investigation that might last up to two days, report, in turn, to AHM. AHM would then make the decision whether such instances should be reported. In fact, the administrator of Claywest, Betty Via,[2] confirmed that at a meeting of nursing homes managed by AHM, the attendees were instructed that they could not hotline an incident until they had gone through the corporate office and had spoken to either Kaiser or one of two other people. Kaiser had a history of punishing employees who had provided the Division of Aging with evidence of substandard care. Via bluntly testified that she felt she would lose her job if she hotlined the incidents involving Marshall Rhodes.

Marshall Rhodes, who could not walk and suffered from Alzheimer's disease, slept on a mattress that was just six inches off the floor. On July 28th, 1999, Karl Willard[3] told two nurse's assistants that a resident threw his medicine on him and that Willard was "going to fuck him up." One of the assistants thought Willard was talking about Rhodes because he was standing in front of Rhodes's door at the time, but she did not take Willard's statements seriously because she thought he was just mad. About an hour-and-a-half later Willard came out of Rhodes's room. The same assistant asked Willard what he was doing in there and Willard made an

1. All statutory references are to RSMo 2000.

2. Federal authorities agreed not to prosecute Via and the State prosecutor dropped all charges against her in exchange for her testimony against the defendants.

3. Karl Willard, a Claywest employee, entered an Alford plea to first-degree elder abuse and was sentenced to 15 years in prison.

unintelligible response. Both assistants at that time entered Rhodes's room and found Rhodes in the dark behind the door with his hands up "like he was defending himself." Rhodes's forehead was bleeding, and he asked, "Why do I get abused?"

Some days later, just past midnight and into the early morning hours of August 3rd, a nurse's assistant was called to Rhodes's room, where she found Rhodes with his face covered in blood and scratches, and his hospital gown torn in half. There was "blood everywhere." Another Claywest employee testified that she saw a laceration on Rhodes's lower lip and that he appeared to have been beaten, and she told Via, the administrator, that Rhodes looked like he had been beaten.

Yet another employee testified that she saw Rhodes in his bed with his face cut up and bruised and that she proceeded to ask Via who had beaten Rhodes up. Via retorted that Rhodes had not been beaten up, to which the employee replied that there was a difference between a fist hitting a face and a face hitting the floor, and that Rhodes had been beaten up. She said that Via replied that she should mind her own business and that Via would get a statement from those who were involved. According to the medical records from Claywest, Rhodes may have rolled off his low bed onto the floor, injuring himself.

The nurse on duty took Rhodes's vital signs and called 911 to take him to the hospital. There Rhodes was treated and released back to Claywest within a matter of hours. One of the two nurse's assistants who had originally witnessed Willard's threat against Rhodes saw Rhodes after his release from the hospital. She said he appeared to have been "beat up real bad, he was bruised, his face was purple, his lips were swollen." She talked to the other nurse's assistant who had heard Willard's threat and they decided to report their suspicions about Willard to Via and the nursing director. On August 4th, they told both the director and Via that they thought Willard had beaten up Rhodes on July 28th. Shortly thereafter, one of these reporting nurse's assistants was fired.

Yet another nurse's assistant at Claywest testified that she saw Rhodes's face while he was sitting in a wheelchair at the nurses' station after he returned from the hospital. She recalled that his lip was swollen, his face was discolored, and the side of his face was swollen. She concluded that he appeared to have been hit multiple times. She told Via what she saw, that it looked like Rhodes had been hit and not like he had fallen. Via told her that she was not involved and that Via would question the people on duty the night Rhodes suffered the injuries.

On August 5th, Rhodes was found sitting in a wheelchair, unresponsive and with fixed, dilated eyes that were uneven in size, symptoms that were indicative of some kind of pressure on the brain. Rhodes was put in bed and had oxygen administered, and immediately thereafter taken back to the hospital, where he died on August 7th. The cause of death was originally given as aspiration pneumonia. The St. Charles Medical Examiner's Office began an investigation after being alerted by the funeral home that the death certificate now indicated a subdural hematoma. An investigator from the medical examiner's office contacted Claywest and its director of nursing, but was never told that anyone suspected Rhodes had been beaten. The medical examiner concluded that Rhodes had died of a head injury at the hands of another and instituted an investigation by the police.

On August 5th and 6th, 1999, Jeanne Harper, a facility surveyor with the Division of Aging, had a team in Claywest

during a partial survey. Yet no one told her of any of the incidents involving Rhodes.

Via called Kaiser on August 9th, and advised him of the suspected abuse of Rhodes and that she believed it should be hotlined. Via again spoke with Kaiser about the matter on August 11th. On August 12th, Via met with Kaiser at corporate headquarters and reiterated that she thought the incidents needed to be hotlined, but Kaiser insisted that there be no hotline because he was meeting with Jeanne Rutledge, one of the supervisory personnel at the Division of Aging on August 13th, and he would raise with her the issue of whether a hotline call needed to be made. Rutledge testified that she met with Kaiser on the 13th, but that he never offered any significant details involving the suspected abuse of Rhodes and never even told her that Rhodes had died.

Via testified that she called Kaiser the afternoon of the 13th, and Kaiser told her that he had gone over the information with Rutledge and that she had said it did not need to be hotlined because it was an accident or injury of unknown origin. Kaiser told her they could simply "run it all through the team leader." Via called Harper, the team leader, that same afternoon, but was not able to speak with her until August 16th. During their conversation on the 16th, Via did not report any suspected abuse of Rhodes, but only told Harper that Rhodes had fallen twice, once on July 29th and again on August 3rd. She told Harper that Kaiser had told her that he had talked to Rutledge, and that Rutledge had told him that a report to her as team leader was all that was required. Via also told Harper she was not hotlining the incident because Kaiser had instructed her not to. Via never told Harper that Rhodes had died.

Harper called Via the next day, August 17th, and instructed her that the Rhodes incident needed to be hotlined. That same day, Via sent Kaiser the following e-mail:

Chuck,

Yesterday I spoke with Jeanne Harper and gave her some of the details of the M. Rhodes incident and she phoned back today and said her supervisor said I must HOTLINE this. So she is not taking any more of the details from me, but wants me to call it in. PLEASE RESPOND!! She did tell her supervisor that we had been working on the investigation and that is why we waited to call.

Betty

(Emphasis in original.) On August 18th, Kaiser responded as follows:

You may tell her that I personally spoke to Jeanne Rutledge who said this was an accident or injury of unknown origin that needs to be reported to the Team Leader. It is NOT a suspected abuse or neglect, and as such, is NOT something that gets Hotlined.

*Chuck Kaiser*

(Emphasis in original.)

Via never reported the suspected abuse. Kaiser never reported the suspected abuse. In fact, no one from Claywest or AHM ever reported the suspected abuse of Marshall Rhodes to the Division of Aging. The defendants were charged with failure to immediately report elder abuse. Upon consideration of this evidence, the jury found the defendants guilty of failure to report. The court thereafter imposed the maximum penalties allowable for this misdemeanor. The defendants now raise eight points in their appeal.

*Standard of Review—Points I–V*

On review, the Court accepts as true all of the evidence favorable to the State,

including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). In reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.*

In their first point, the defendants maintain that the trial court erred in denying their motion for judgment of acquittal because there was insufficient evidence that they violated Section 565.188 in that Rhodes was a resident of a skilled-nursing facility and Section 565.188 does not apply to an alleged failure to report suspected abuse of a resident of a skilled-nursing facility.

The defendants were properly charged and convicted of failure to report elder abuse under Section 565.188. The primary rule of statutory interpretation requires that we ascertain the legislature's intent by considering the plain and ordinary meaning of the words of the statute. *State*

*v. Wahl,* 89 S.W.3d 513, 516 (Mo.App. E.D. 2002); *Hadlock v. Director of Revenue,* 860 S.W.2d 335, 337 (Mo.banc 1993). Each word, clause, sentence, and section of a statute should be given meaning. *State v. Van Horn,* 625 S.W.2d 874, 877 (Mo.1981). Statutes are construed together and harmonized if possible. *Id.* With these precepts in mind, we shall begin with consideration of the statute.

The defendants were charged and convicted of failure to report elder abuse under Section 565.188, enacted by the legislature in 1992.[4] That statute condemns as criminal the failure to report elder abuse by certain persons commonly entrusted with the care of senior citizens. If such a person has reasonable cause to suspect that a senior under his charge has been abused, he shall immediately report such abuse or risk the sanctions of fine and incarceration. The legislature's intent in enacting this law is transparent—to protect our senior citizens from abuse and to punish those that would do them harm.

The defendants argue that instead they should have been prosecuted under an ear-

---

4. 565.188. Report of elder abuse, penalty—false report, penalty—evidence of prior convictions

1. When any physician; medical examiner; coroner; dentist; chiropractor; optometrist; podiatrist; resident intern; nurse; hospital and clinic personnel engaged in examination, care or treatment of persons, or other health practitioners; psychologists; mental health professional; social worker; adult day care center worker; nursing home worker; probation or parole officer; Christian Science practitioner; peace officer or law enforcement official, or other person with responsibility for the care of a person sixty years of age or older has reasonable cause to suspect that such a person has been subjected to abuse or neglect or observes such a person being subjected to conditions or circumstances which would reasonably result in abuse or neglect, he shall immedi-

ately report or cause a report to be made to the department in accordance with the provisions of sections 660.250 to 660.295, RSMo. Any other person who becomes aware of circumstances which may reasonably be expected to be the result of or result in abuse or neglect may report to the department.

2. Any person who knowingly fails to make a report as required in subsection 1 of this section is guilty of a class A misdemeanor.

In 2003, the above statute was amended. The 2003 statute no longer specifically denominates a "nursing home workers" as a mandated reporter. The 2003 statute instead lists the same mandated reporters as Section 198.070. Of course, a nursing home worker may still be a mandated reporter under the 2003 statute as, for example, a "long-term care facility...employee."

lier statute, Section 198.070,[5] that the legislature had passed to protect nursing-home residents from abuse. That the defendants could have been so prosecuted, we do not dispute. However, the prosecutor was free to charge the defendants under either statute.

■ It is axiomatic that a single act may constitute an offense under two different statutes. *State v. Koen,* 468 S.W.2d 625, 629 (Mo.1971). It is then the responsibility of the prosecutor to elect under which statute to proceed. *State v. Grady,* 691 S.W.2d 301, 303 (Mo.App. E.D.1985), citing *State v. Jackson,* 643 S.W.2d 74, 77 (Mo. App. W.D.1982). For example, in *State v. Pembleton,* 978 S.W.2d 352 (Mo.App. E.D. 1998), this Court examined whether a drunk driver could properly stand convicted of second-degree felony-murder rather than involuntary manslaughter for the three deaths he caused. The defendant argued that he should have been prosecuted under the more specific involuntary-

manslaughter statute. *Id.* at 355. We upheld the convictions for second-degree murder, noting that only when two statutes cannot be reasonably harmonized does the more specific prevail over a more general statute. *Id.* More importantly, we held that because Missouri courts recognize that a prosecutor has discretion to prosecute under either of two statutes, the statutes were reasonably harmonized. *Id.* at 356. Our Supreme Court has likewise held, quoting *State v. Gibson,* 623 S.W.2d 93, 101 (Mo.App. W.D.1981), that " 'the legislature may provide that the same facts may constitute separate offenses ... If this is done, it rests in the discretion of the prosecution as to which charge is to be brought.' " *State v. Hermanns,* 641 S.W.2d 768, 770 (Mo.banc 1982). *See also State v. Malveaux,* 604 S.W.2d 728, 735 (Mo.App. W.D.1980); *Grady,* 691 S.W.2d at 303, and *State v. Goebel,* 83 S.W.3d 639, 645–647 (Mo.App. E.D.2002).

---

5. 198.070. Abuse or neglect of residents—reports, when, by whom—contents of report—failure to report, penalty—investigation, referral of complaint, removal of resident—confidentiality of report—immunity—prohibition against retaliation—penalty—employee disqualification list

1. When any adult day care worker; chiropractor; Christian Science practitioner; coroner; dentist; embalmer; employee of the departments of social services, mental health, or health and senior services; employee of a local area agency on aging or an organized area agency on aging program; funeral director; home health agency or home health agency employee; hospital and clinic personnel engaged in examination, care, or treatment of persons; in-home services owner, provider, operator, or employee; law enforcement officer; long-term care facility administrator or employee; medical examiner; medical resident or intern; mental health professional; minister; nurse; nurse practitioner; optometrist; other health practitioner; peace officer; pharmacist; physical therapist; physician; physician's assistant;

podiatrist; probation or parole officer; psychologist; social worker; or other person with the care of a person sixty years of age or older or an eligible adult has reasonable cause to believe that a resident of a facility has been abused or neglected, he or she shall immediately report or cause a report to be made to the department.

2. The report shall contain the name and address of the facility, the name of the resident, information regarding the nature of the abuse or neglect, the name of the complainant, and any other information which might be helpful in an investigation.

3. Any person required in subsection 1 of this section to report or cause a report to be made to the department who knowingly fails to make a report within a reasonable time after the act of abuse or neglect as required in this subsection is guilty of a class A misdemeanor.

4. In addition to the penalties imposed by this section, any administrator who knowingly conceals any act of abuse or neglect resulting in death or serious physical injury, as defined in section 565.002, RSMo, is guilty of a class D felony.

Let us consider the two statutes at issue here. Again, the defendants were convicted of violating Section 565.188, enacted in 1992, requiring mandated reporters to immediately report abuse of senior citizens in their charge. Yet they claim they should have been prosecuted for violating Section 198.070, largely unchanged since its passage in 1979, requiring mandated reporters to report abuse of nursing-home residents within a reasonable time.

Certainly, the defendants cannot claim that Section 198.070 entirely repealed by implication the provisions of Section 565.188 since Section 198.070 has remained largely unchanged since 1979, whereas Section 565.188 was not enacted until 1992. It cannot be that the earlier statute repealed the more recently-enacted statute under which they were prosecuted. *Levinson v. State,* 104 S.W.3d 409, 412 (Mo. banc 2003).

■ Instead, the defendants claim that the statutes are in "conflict" and the only way to harmonize them is to hold that Section 565.188 applies only to senior citizens who are not in nursing homes. Yet Section 565.188, the statute under which the defendants were quite properly convicted, specifically names "nursing home workers" as mandated reporters, entirely defeating this argument. Why would "nursing home workers" be mandated reporters if, as the defendants urge, nursing-home residents have no protection under the statute? Obviously, the legislature simply intended that Section 565.188 would add to the protections already afforded nursing-home residents by Section 198.070.

■ Further, even if there was an apparent inconsistency between the two statutes, it would remain our duty to attempt to reconcile the statutes and apply them both. *County of Jefferson v. Quiktrip,* 912 S.W.2d 487, 490 (Mo.banc 1995), citing *State ex rel. McNary v. Stussie,* 518 S.W.2d 630, 635 (Mo.banc 1974); *State v. Kraus,* 530 S.W.2d 684, 686 (Mo.banc 1975); *State ex inf. Ashcroft v. City of Fulton,* 642 S.W.2d 617, 620 (Mo. banc 1982). Repeals by implication are not favored. *Quiktrip,* 912 S.W.2d at 490.

■ In any case, there is yet another fatal flaw in the defendants' argument. Even if there were, in some regard, a repugnancy between the two statutes, our Supreme Court has consistently held that it is the later-enacted statute that operates to the extent of the repugnancy to repeal the earlier-enacted statute. *Levinson,* 104 S.W.3d at 412; *Quiktrip,* 912 S.W.2d at 490; *Morrow v. City of Kansas City,* 788 S.W.2d 278, 281 (Mo.banc 1990). Also see Norman J. Singer, *Sutherland on Statutory Construction* § 23.9 (6th ed. 2002) ("[W]hen two statutes are repugnant in any of their provisions, the later act ... operates to the extent of the repugnancy to repeal the first.") Thus, even if a repugnancy could be unearthed from the substrata of these statutes, it is the later-enacted statute, Section 565.188, the statute under which the defendants were convicted, that would operate to repeal by implication a repugnant provision of the earlier-enacted law, Section 198.070, the statute under which the defendants claim they should have been prosecuted.

But there simply is no "conflict" or repugnancy between the two statutes. It is true the statutes possess distinct factual elements and create distinct duties. Indeed, that is the essence of criminal statutes. But there is no repugnancy between the two statutes. Rather they both bespeak our legislature's longstanding condemnation of the abuse of our elders. And it is within the legislature's province to create more than one crime whereby the abuse of our elders may stand condemned. It then becomes the duty of the prosecu-

tor, not the defendant, to choose under which statute the accused shall be called to the bar of justice. Point denied.

In their second point, the defendants claim the trial court erred in denying Kaiser and AHM's motion for judgment of acquittal because Kaiser and AHM are not mandated reporters within the meaning of Section 565.188 in that Kaiser and AHM provided only management services to Claywest and were therefore not persons directly responsible for providing care to Rhodes.

■ Section 565.188 provides in pertinent part, that "[w]hen any ... *person with responsibility for the care of a person sixty years of age or older* has reasonable cause to suspect that such a person has been subjected to abuse or neglect or observes such a person being subjected to conditions or circumstances which would reasonably result in abuse or neglect, he or she shall immediately report or cause a report to be made to the department in accordance with the provisions of sections 660.250 to 660.295, RSMo." (Emphasis added.)

Claywest was licensed by the State of Missouri as a skilled-nursing facility. AHM had a management agreement pursuant to which AHM supervised the operations of Claywest. Kaiser was the president of AHM. Betty Via, Claywest's administrator, was hired and supervised by AHM and Kaiser. AHM and Kaiser, in supervising Claywest's operations, were "responsible for the care of a person sixty years of age or older," and thus were mandated reporters under the above statute. AHM and Kaiser are not free to promulgate policies and issue orders that avoid the immediate report of abuse, and then protest that they have

no responsibility for the care of the persons so abused.

■ Moreover, as to Kaiser, there is a more fundamental reason his claim is meritless. Kaiser was convicted as an accessory to Via. A defendant can be convicted as an accessory when, either before or during the commission of the offense, he aids such person in committing the offense. Section 562.041.1(2). And it is no defense that the defendant does not belong to that class of persons legally capable of committing the offense. Section 562.046(2). Thus, whether Kaiser was a mandated reporter or not, he could properly be convicted as an accessory to Via in her failure to report elderly abuse. Point denied.

In the third point on appeal, AHM asserts that the trial court erred in denying its motion for judgment of acquittal because there was no evidence that Kaiser had reasonable cause to suspect that Rhodes had been subjected to abuse between July 28, 1999 and August 5, 1999, as submitted in Instruction No. 8, because the evidence showed that Kaiser was first made aware of the incident on August 9, 1999.

■ We should note that in ruling on a motion for judgment of acquittal, a trial court considers the sufficiency of the evidence to sustain the offense as charged in the indictment or information. Rule 27.07(a).[6] AHM complains that the charge was not submissible against it because Kaiser was unaware of the abuse until August 9th. First, this point erroneously posits that AHM's liability could only be grounded in Kaiser's knowledge of the abuse and ignores AHM's liability for its own employee handbook and its own instructions to its managers not to immediately report abuse. Second, Kaiser's knowledge on August 9th of the abuse is sufficient to sustain the

---

**6.** All rule references are to Mo. R. Civ. P. 2003.

offense as it was charged against AHM in its indictment that stated the offense occurred "on or about August 12, 1999." Rule 23.01(b)(3) provides that the indictment or information shall state only the time of the offense charged "as definitely as can be done." The law does not demand impossible precision. *State v. Higdon,* 774 S.W.2d 498, 500 (Mo.App. E.D. 1989). Third, as we shall discuss later, this crime is essentially a continuing crime of omission. The primary purpose of an indictment or information is to give general notice to the defendant of the charge against him, and the Rule assumes there will be situations where it will be impossible for the prosecutor to determine the exact date and time that a crime was committed and the indictment will charge an offense to have occurred during a span of time. *Id.*

■ It seems that AHM's real complaint is as to the form of the instruction. AHM argues that the verdict director, at least inferentially, required that Kaiser's knowledge, which was then imputed to AHM, to have occurred no later than August 5th when, in fact, Kaiser did not know of the abuse until August 9th. However, AHM needed to object to the instruction on this basis at trial to preserve the issue for appellate review. Rule 28.03. Point denied.

In the fourth point on appeal, Kaiser complains that the trial court erred in denying his motion for judgment of acquittal because there was insufficient evidence that he was an accessory to Claywest's or Via's failure to report elder abuse in that Rhodes died before Kaiser was told of the incident by Via and the principal's alleged crime was therefore complete before Kaiser was even aware the Rhodes incidents occurred.

In his argument of this point, Kaiser argues that there was insufficient evidence that he was an accessory to Via's failure to report in two different regards that we address in turn.

■ First, Kaiser argues that he could not have been an accessory to Via's failure to report because her failure to immediately report the abuse was complete on August 6th, whereas he did not aid her in her failure to report until August 9th when he learned the particulars of the abuse of Marshall Rhodes. We reject this reasoning. Kaiser ignores that, as president of AHM, he aided Via in her failure to report by institutionalizing a policy of dilatory reporting of abuse. It was Kaiser who was identified as having been "in charges of policies" at Claywest. Furthermore, Kaiser assumes that Via's failure to report is a completed act on August 6th. But failure to report elderly abuse is a crime of omission and, as such, is a continuing crime that is not complete at the time of the initial failure to report, but rather continues so long as the duty to report exists. If we adopted Kaiser's line of reasoning, it would mean the law imposed no duty on a caretaker to report abuse after they first knew of the abuse and then failed to report it. To the contrary, we think the duty to report must continue at least so long as the report of abuse may operate to ameliorate the circumstances of either the victim or another similarly-situated senior citizen, or to bring the abuser to justice.

■ Second, Kaiser argues that he could not have been an accessory to Via's failure to report abuse since Rhodes had died on August 7th, two days before he knew the particulars of Rhodes's abuse. Again, Kaiser ignores his role as president of AHM in institutionalizing delayed reports of abuse. But, boiled downed to its essence, Kaiser's argument is that there is no duty to report abuse as to a senior

citizen that has already been killed. We reject this remarkably callous argument. Kaiser apparently believes that the legislature created a duty to report life-threatening abuse, but not life-ending abuse. This would indeed create perverse incentives for those charged with the care of the elderly. But this hard-hearted defense finds no support in the statute. We note that the statute mandates reports of suspected abuse by medical examiners and coroners. Section 565.188. Obviously, these reporters would likely have contact with an abused or neglected senior citizen only after his or her death. Kaiser argues that the sole reason animating the legislature in its promulgation of this law is the desire to provide protective services to the victim of abuse and any need for these services terminates with the victim's last breath. We agree that one of the purposes of the law is to provide protective services, but this is not its sole purpose. As we noted earlier, the purpose of the legislation is to protect our senior citizens from abuse and to punish those that would do them harm. Thus the duty to report abuse does not terminate with the death of the victim because a report of abuse may nevertheless operate to ameliorate the circumstances of another similarly-situated senior citizen or to bring the abuser to justice. Point denied.

 In the fifth point on appeal, Kaiser contends that the trial court erred in denying his motion for judgment of acquittal because there was insufficient evidence that he aided or encouraged Via to violate Section 565.188 in that the undisputed evidence established that Kaiser directed Via to report all the information she had on the Rhodes incident to an employee of the Department of Social Services which is an approved method of reporting under the statute.

Section 660.255.2 requires that "[t]he report shall be made orally or in writing. It shall include, if known:

(1) The name, age, and address of the eligible adult;

(2) The name and address of any person responsible for the eligible adult's care;

(3) The nature and extent of the eligible adult's condition; and

(4) Other relevant information."

First, Kaiser again ignores evidence of institutionalized delayed reporting. Second, Kaiser mischaracterizes the evidence. Kaiser wrote to Via telling her that the incident involving Rhodes did not need to be reported as suspected abuse in that it was only an accident or injury of unknown origin. Kaiser also told Via that he did not want the incident hotlined. Kaiser told Via to just call Harper, their team leader from the Department of Social Services. Kaiser argues that his instruction to Via to make a report to Harper was entirely sufficient to discharge his duty to report. Yet Kaiser's communications with Via were on August 13th and 17th. Kaiser had known of Marshall Rhodes's suspected abuse since August 9th. This is not, by any stretch of the imagination, "immediate" reporting. Moreover, this argument boldly ignores the fact that Kaiser never told Via to report suspected abuse. Rather, Kaiser's e-mail to Via stated that the incident involving Rhodes was *an accident or injury of unknown origin that needed to be reported to the team leader,* and that it was *not* suspected abuse. Neither Via nor Kaiser ever reported the suspected abuse of Marshall Rhodes. In fact, no one from Claywest or AHM ever did report the abuse. All Kaiser ever told Via to report was that Rhodes had suffered an accident or injury of unknown origin, and this instruction clearly did not satisfy the requirements of Sections 565.188 and 660.255. And, when Via finally did speak

with Harper on the 16th, Via just told her that Rhodes had fallen twice. Via, of course, omitted any mention of Rhodes's death. Point denied.

### Standard of Review, Points VI–VIII

We review the admission of evidence for abuse of discretion. *State v. Mayes*, 63 S.W.3d 615, 627 (Mo.banc 2001). "Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *State v. Gardner*, 8 S.W.3d 66, 73 (Mo.banc 1999)

In their sixth point, the defendants aver that the trial court erred in admitting evidence of Division of Aging reports on Claywest predating the events in question by several months and in permitting the prosecutor to read excerpts from the reports relating to allegations of neglect with respect to residents other than Rhodes because evidence of other uncharged misconduct was legally irrelevant because its prejudicial effect outweighed its probative value.

At trial, the prosecutor adduced evidence of deficiency reports prepared by the Division of Aging after inspections of Claywest in 1998 and 1999. The evidence was powerful. A woman, R.C., was discovered in her room covered with ants that were crawling out of her eyes, ears, mouth, and vagina. Another resident was found slouched in her chair with her clothing saturated with urine for a period of hours. Another woman was found with three crushed vertebra and a broken rib. Yet another woman's bed sores went untreated by aides "because it had been a bad day."

And yet another woman who died of pneumonia went without food or drink for five days before her death. We are mindful that this evidence would rightly disgust the average juror. Yet the question before us is not simply whether the evidence was powerful and disgusting. Clearly it was. The question is whether the trial court abused its discretion in holding the evidence was logically and legally relevant.

Logical relevance is established where the evidence in question tends to directly establish a defendant's guilt. *State v. Barriner*, 34 S.W.3d 139, 144 (Mo.banc 2000). Legal relevance is established when the evidence's probative value outweighs its prejudicial effect. *Id.* at 145. Evidence of prior uncharged misconduct generally has a legitimate tendency to prove the specific crime charged when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan, or the identity of the person charged with the commission of the crime on trial. *Id.* This list of exceptions is not exhaustive. *Id.*

Here, evidence of prior crimes or bad acts was admissible to show motive. In this case, the deficiency reports were admissible to show the defendants' motive not to report any suspected abuse. Rutledge had testified that if someone were to make a hotline call, it would trigger an investigation that could go beyond the specific allegation hotlined. Rutledge testified that the investigators would pursue anything that they saw while they are in the facility, and that Claywest had not fared well in the past when inspectors looked at their operation. Indeed, Claywest was in danger of losing its license. The evidence of the substandard care of other residents reveals the defendants' motive in failing to report the suspected abuse of Marshall Rhodes.

Evidence of prior bad acts was also admissible to show an absence of mistake. The prosecutor was free to adduce other instances of suspected abuse and neglect to show that the failure to report the abuse of Marshall Rhodes was not an isolated oversight. In fact, the defense persisted throughout trial in claiming they had tried in good faith to comply with the reporting law. The jurors were entitled to know that other instances of abuse and neglect went unreported.

The evidence also betrayed a common scheme and plan. *State v. Bernard*, 849 S.W.2d 10, 13–16 (Mo.banc 1993). The AHM employee handbook, the instructions given at a meeting of nursing homes managed by AHM, and the pattern of dilatory reporting and non-reporting of other instances of abuse all betray an institutionalized common scheme and plan to fail to report abuse.

■ We now turn to the question whether the prejudicial effect of this evidence outweighed its probative value. We do not underestimate the impact that this evidence may have had upon the jury. But the mere fact that the evidence is revolting and harmful to the defense does not justify its exclusion. In certain trials, evidence that is revolting is to be expected. The adjudication of crimes is not for the faint of heart. Here, the admission of the evidence is amply justified by several exceptions to the general prohibition of evidence of other crimes. Further, the trial court was in a superior position to weigh the prejudicial effect of the evidence against its probative value. Finally, it is the defendants' burden to demonstrate that the trial court's ruling was clearly against the logic of the circumstances and was so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. The admission of this evidence does not shock our

sense of justice and we find no lack of careful consideration by the trial court. Point denied.

In their seventh point, the defendants state that the trial court erred in admitting Rutledge's personal opinion of Kaiser's honesty because such evidence is inadmissible unless the defendant first offers evidence of his good character, which here the defendant did not do, and because only evidence of a defendant's reputation in the community—not the witness's personal opinion—is admissible.

■ The defendants' attorney had cross-examined Rutledge as to whether she had a Division of Aging attorney with her when she had a meeting with police investigators in February 2000. Apparently the defense wanted to imply that Rutledge had something to hide and so, during Rutledge's re-direct examination, the prosecutor retaliated. The prosecutor asked Rutledge whether she also had an attorney in her office with her when she met with Kaiser on August 13, 1999. The following ensued:

Q. (By Prosecutor): Why did you do it [have an attorney present] in this case with Mr. Kaiser over there?

A. (By Rutledge): Because in my past acquaintance with Mr. Kaiser, he has shown me he is a master of—

DEFENSE COUNSEL: Judge, I'm going to object to this.

THE COURT: Overruled on that basis.

DEFENSE COUNSEL: Well, I should say improper foundation. It is not responsive to the question. It is going into character assassination.

THE COURT: Overruled.

PROSECUTOR: I think it is an accurate characterization of his—

DEFENSE COUNSEL: I'm going to object to this, it is totally inappropriate.

THE COURT: I told you all early on before we ever started the trial, all three of you, not to make speaking objections. You all have chosen to make the speaking objections. I'm willing to listen to them. So I'm overruling that objection.

Q. (By Prosecutor): You were explaining why you felt the need with Mr. Kaiser to have an attorney present?

A. I said my past experience with Mr. Kaiser has shown that he was a master of obscuration [sic], of dishonesty and I was not going to be talked into a corner that I could not retrieve myself from.

So I asked someone under my supervision to sit in the room with me and to be there to make sure that we both heard what was said and that I had a witness because I didn't trust Mr. Kaiser.

■ First, we observe that the exact objection or objections being put forth to the testimony could be more precisely phrased. Second, we note that this testimony was, to some extent, merely rehabilitative. Defense counsel tried to impugn the witness for having an attorney present with the police investigators. The prosecutor was entitled to show she took the same precaution when meeting with Kaiser. "Where the defendant has injected an issue into the case, the state may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects." *State v. Weaver*, 912 S.W.2d 499, 510 (Mo.banc 1995). Third, the prosecutor's redirect examination may have wandered somewhat far from the opened door's threshold when he elicited the reason that Rutledge had an attorney present for her meeting with Kaiser, for this allowed Rutledge to opine on Kaiser's dishonesty. However, Rutledge had already testified, without objection, that Kaiser had entirely misrepresented her conversation with him when he claimed that she had said that there was no need to report the incident involving Marshall Rhodes. We perceive no additional prejudice to Kaiser from her characterization of him as obfuscating and dishonest. Point denied.

In their eighth point, the defendants allege that the trial court erred in permitting the prosecutor to ask Kaiser about settlements with families of residents because evidence of settlements in civil cases is irrelevant in criminal cases to show guilt and the evidence was not relevant for any other reason.

There appear to be no Missouri cases addressing the general admissibility of civil settlements in a criminal case, other than where the criminal defendant made a "settlement offer" in a bid to get the victim to withdraw the prosecution. See, e.g., *State v. Tash*, 528 S.W.2d 775, 781 (Mo.App. 1975); *State v. Alexander*, 499 S.W.2d 439, 441 (Mo.1973); *State v. Christian*, 245 S.W.2d 895, 897 (Mo.1952). There was no such evidence here. There are civil cases, of course, which hold that evidence of a settlement offer cannot be used against a party in the same case. See, *A.G. Edwards & Sons, Inc. v. Drew*, 978 S.W.2d 386, 392 (Mo.App. E.D.1998) (Proof of compromise or settlement with a third party is not admissible to prove the validity or invalidity of a claim); *State ex rel. Malan v. Huesemann*, 942 S.W.2d 424, 427 (Mo. App. W.D.1997) (In order to further public policy favoring settlement of disputes, it is well established that settlement offers are not admissible in a subsequent trial).

In the instant case, there were two mentions of civil settlements. As to the first, the trial court sustained the defendants' objection and granted their request that the comment be stricken when the prosecutor sought to elicit testimony from Kaiser regarding a civil suit by Marshall

Rhodes's family. The defendants did not ask for further relief. Accordingly, the trial court cannot be found in error when it granted all the relief requested. *State v. Rhodes*, 829 S.W.2d 41, 43 (Mo.App. E.D. 1992).

The other reference to a civil settlement occurred after Kaiser denied on cross-examination that he had heard allegations that ants were found crawling out of R.C.'s. eyes, ears, mouth, and vagina. AHM, of which Kaiser was both president and chief legal counsel, had been sued over this incident and AHM's insurance carrier had settled the claim prior to trial. The prosecutor asked Kaiser about this settlement in order to discredit the veracity of his answer that he was ignorant of the incident. Defense counsel failed to make a timely, specific objection to the questions about the civil settlement, and therefore did not preserve this complaint for review. *State v. Oglesby*, 103 S.W.3d 890, 891 (Mo. App.E.D.2003). In any case, the scope of cross-examination is largely within the discretion of the trial court. *State v. Taylor*, 944 S.W.2d 925, 935 (Mo.banc 1997). We find no error, plain or otherwise, in allowing this line of questioning to test Kaiser's claim of ignorance of this incident. Point denied.

The judgment of the trial court is affirmed.

CLIFFORD H. AHRENS, P.J., concurs.

WILLIAM H. CRANDALL, JR., dissents in separate opinion.

WILLIAM H. CRANDALL, JR., Judge, dissenting.

I dissent.

In reviewing the evidence in this case, I am mindful of the concurring opinion of Judge Seiler in *State v. Trimble*, 638 S.W.2d 726, 739 (Mo. banc 1982), and paraphrase it as follows: What was permitted to take place at Claywest is a disgrace. "All hope abandon, ye who enter here" would be a fitting inscription for Claywest's portals, just as over the gates of Dante's Hell.

In their first point, defendants claim that the trial court erred in denying their motion for judgment of acquittal because there was not sufficient evidence that they violated section 565.188, the statute under which they were charged and convicted. They argue that because Mr. Rhodes was a resident of a skilled nursing facility, section 565.188 did not apply when they failed to report the suspected abuse, but that the proper statute under which to charge them was section 198.070 RSMo 2000.

There are three statutes dealing with the reporting of abuse of those persons sixty years of age or older. The statute under which defendants were charged, section 565.188, is contained within the Chapter titled "Offenses Against the Person." Sections 565.180 to 565.190, passed in 1992, are statutes specifically relating to "Elder Abuse." Section 565.188 mandates that certain people report suspected abuse or neglect and sets forth the penalty for failure to do so:

1. When any physician, medical examiner, coroner, dentist, chiropractor, optometrist, podiatrist, resident intern, nurse, hospital and clinic personnel engaged in examination, care or treatment of persons, or other health practitioners, psychologists, mental health professional, social worker, adult day care center worker, nursing home worker, probation or parole officer, Christian Science practitioner, peace officer or law enforcement official, or other person with responsibility for the care of a person sixty years of age or older

has reasonable cause to suspect that such a person has been subjected to abuse or neglect or observes such a person being subjected to conditions or circumstances which would reasonably result in abuse or neglect, he shall immediately report or cause a report to be made to the department in accordance with the provisions of section 660.250 to 660.295, RSMo. Any other person who becomes aware of circumstances which may reasonably be expected to be the result of or result in abuse or neglect may report to the department.

2. Any person who knowingly fails to make a report as required in subsection 1 of this section is guilty of a class A misdemeanor.

Section 565.188 thus requires that the report be made immediately and imposes penalties on someone who knowingly fails to report.

Another statute dealing with the reporting of elder abuse is contained in Chapter 660, which is titled "Department of Social Services." Passed in 1992, section 660.300 pertains to the duty to report abuse and neglect of in-home services clients. Section 660.250(6) defines an "in-home services client" as "an eligible adult who is receiving services in his or her private residence through any in-home services provider agency." An "eligible adult" includes "a person sixty years of age or older." Section 660.250(5). Section 660.300 mandates the reporting of abuse or neglect of in-home services clients and sets forth the penalty for failure to do so:

1. Beginning January 1, 1993, when any physician, dentist, chiropractor, optometrist, podiatrist, intern, nurse, medical examiner, social worker, psychologist, minister, Christian Science practitioner, peace officer, pharmacist, physical therapist, in-home services owner, in-home services operator, in-home services employee, or employee of the department of social services or of the department of health or of the department of mental health has reasonable cause to believe that an in-home services client has been abused or neglected, as a result of in-home services, he shall immediately report or cause a report to be made to the department.

2. Any person required in subsection 1 of this section to report or cause a report to be made to the department who fails to do so within a reasonable time after the act of abuse or neglect is guilty of a class A misdemeanor.

Under subsection 2, the penalty for failing to report is imposed if one charged with the duty to report fails to do so within a reasonable time after the abuse or neglect has occurred.

A third statute regarding the reporting of elder abuse is a provision under the so-called Omnibus Nursing Home Act, sections 198.003 to 198.186 RSMo 2000, which was passed in 1979 by the Missouri legislature and was designed to provide comprehensive regulation of the nursing home industry in Missouri. The Act contains provisions relating to the reporting of the abuse or neglect of residents of certain facilities covered under the Act. Section 198.070. A "resident" is defined as "a person who by reason of aging, illness, disease, or physical or mental infirmity receives or requires care and services furnished by a facility and who resides or boards in or is otherwise kept, cared for, treated or accommodated in such a facility for a period exceeding twenty-four consecutive hours." Section 198.006(14). There are different types of facilities included

under the generic term "facility" and each are defined in section 198.006, including "skilled nursing facility" in section 198.006(17). Section 198.070 mandates the reporting of abuse or neglect of residents of skilled nursing facilities and sets forth the penalty for failure to do so:

1. When any physician, dentist, chiropractor, optometrist, podiatrist, intern, nurse, medical examiner, social worker, psychologist, minister, Christian Science practitioner, peace officer, pharmacist, physical therapist, facility administrator, employee in a facility, or employee of the department of social services or of the department of mental health, coroner, dentist, hospital and clinic personnel engaged in examination, other health practitioners, mental health professional, adult day care worker, probation or parole officer, law enforcement official or other person with the care of a person sixty years of age or older or an eligible adult has reasonable cause to believe that a resident of a facility has been abused or neglected, he or she shall report or cause a report to be made to the department. . . .

3. Any person required in subsection 1 of this section to report or cause a report to be made to the department who knowingly fails to make a report within a reasonable time after the act of abuse or neglect as required in this subsection is guilty of a class A misdemeanor.

Thus, section 198.070 imposes a penalty if one charged with the duty to report the suspected abuse of a resident of a skilled nursing home fails to do so within a reasonable time after the abuse or neglect has occurred.

Here, the State argues that the prosecutor had the discretion to determine under which statute to file charges against defendants and could elect to file charges against defendants either under section 565.188 or section 198.070. The primary rule of statutory interpretation requires the court to ascertain the legislative intent by considering the plain and ordinary meaning of the words in the statute. *In re Tri–County Levee Dist.*, 42 S.W.3d 779, 784 (Mo.App. E.D.2001). Each word, clause, sentence, and section of a statute should be given meaning. *Id.* Statutes are construed together and harmonized if possible. *Id.* Considering the entire legislative scheme and the plain meaning of the language used, the court must attempt to harmonize each statutory enactment. *Id.* The legislature acts with a purpose, rather than intending a useless act. *Mills v. Director of Revenue*, 964 S.W.2d 873, 875 (Mo.App. E.D.1998).

The record indicates that the prosecutor could have charged defendants for failure to report the suspected abuse of Mr. Rhodes under section 198.070. In its brief, the State acknowledged that "[t]here are two statutes, sections 198.070 and 565.188, mandating a 'hot line' report of suspected abuse" to the Department of Social Services. Under section 198.006(14), Mr. Rhodes was a "resident" in that he was a person who by reason of his physical and mental infirmity received and required the care and services furnished by Claywest and who resided in Claywest for a period exceeding twenty-four consecutive hours. The State did not dispute that Mr. Rhodes was a resident as defined by section 198.006(14). The State also did not dispute that Claywest was a skilled nursing facility as defined by section 198.006(17). Finally, under section 198.070(11), abuse and neglect of residents of nursing homes is punishable as a class D felony. *See, e.g., State v. Boone Retirement Center, Inc.*, 26 S.W.3d 265 (Mo.App.

W.D.2000); *State v. Peoples,* 962 S.W.2d 921 (Mo.App. W.D.1998). It seems incongruous that part of section 198.070 would make it an offense to abuse a nursing home resident, while under a different part of the same statute it would not be an offense for a mandated reporter to fail to report the abuse of a nursing home resident.

Although the State recognizes that the prosecutor could have prosecuted defendants under section 198.070, it argues that the prosecutor could elect to bring charges against defendants under section 565.188 instead, because the failure to report elder abuse was an offense under either statute. The salient issue therefore is whether the prosecutor could charge defendants under section 565.188, as an alternative to section 198.070.

Several factors mitigate against the application of section 565.188 to the present situation. First, both sections 565.188 and 198.070 impose a penalty of a class A misdemeanor for the failure to report suspected abuse. There is no point to having two different statutes, each with the same class A misdemeanor as the penalty, applied to the same incident. This is not a situation where different statutes make the same act either a felony or a misdemeanor. In *State v. Grady,* 691 S.W.2d 301, 302 (Mo.App.1985), the defendant was convicted of forgery for using someone else's credit card to buy gasoline and signing the credit card owner's name on the receipt. On appeal, the defendant argued that the conduct could not be prosecuted as a forgery, a felony under section 570.090.1(3) RSMo 1978, but only as fraudulent use of a credit device under section 570.130.1(1) RSMo 1978, a misdemeanor, because the forgery statute was a general statute and the fraudulent use of a credit card device statute was a specific statute and prevailed over the general statute. *Id.* at 303. This

court reasoned that section 570.090 and 570.130 were not inconsistent; and absent a declaration by the legislature to that effect, neither constituted an exclusive remedy for credit card fraud. *Id.* This court stated, "The fact that substantially the same conduct may amount to an offense under another statute does not render the other statute invalid." *Id.* This is true even if one statute carries a more severe penalty. *Id.*

Similarly, in *State v. Goebel,* 83 S.W.3d 639, 641 (Mo.App. E.D.2002), the defendant challenged the sufficiency of the evidence to convict him of the crime of stealing by deceit under section 570.030 for his failure to report income while receiving public assistance benefits in the form of money and food stamps. He argued that he should have been charged under section 205.967 RSMo 2000. *Id.* Section 205.967 delineated the crime of stealing as it related to public assistance benefits and read in relevant part: "Any person ... who obtains ... by means of a willfully false statement or representation, or by willful concealment or failure to report any fact or event required to be reported ... or by ... other fraudulent device, any public assistance benefits, programs, and services, shall be guilty of the crime of stealing as defined by section 570.030, RSMo, and shall be punished as provided in section 570.030, RSMo." *Id.* at 642. Pointing to the language in section 205.697, which indicated the legislature's intent to make section 570.030 controlling, this court reasoned that welfare fraud was a form of stealing by deceit. *Id.* at 647. This court acknowledged, however, that when an act may constitute an offense under two different statutes, the State may elect under which statute to prosecute. *Id.*

Here, the conduct of failing to report abuse was not either a felony or a misdemeanor based upon which statute the pros-

ecutor elected to prosecute defendants. In contrast to *Grady* and *Goebel*, section 565.188 did not provide for the imposition of a different penalty for failing to report abuse, but imposed the same penalty as section 198.070 for failing to report abuse.

Another factor mitigating against the application of section 565.188 is that although sections 565.188, 660.300, and 198.070 statutorily mandate the reporting of abuse, the status of the "victim" of abuse is different in each statute. Section 198.070 specifically refers to "a resident of a facility." Section 660.300 refers to "in-home services client." Section 565.188 concerns "a person sixty years of age or older." It is clear that the legislature, when it passed sections 565.188 and 660.300, intended to protect those persons not covered by section 198.070. Section 565.188 includes all persons sixty years of age or older who are not covered either by section 198.070 or by section 660.300.

Finally, while the reasons stated above mitigate against the application of section 565.188 to the conduct in the instant action, the conclusive factor indicating that section 565.188 does not apply to the present incident is that the conduct described as an offense in that statute is different from the conduct described in section 198.070. Section 565.188(1) imposes the duty on certain persons to "*immediately* report or cause a report to be made to the department" (emphasis added) if abuse is suspected. If that person "knowingly fails to make a report as required," he or she is "guilty of a class A misdemeanor." Section 565.188(2). Section 198.070(1) also imposes the duty on certain persons to "immediately report or cause a report to be made to the department." Yet, if such a person "knowingly fails to make a report *within a reasonable time* after the act of abuse or neglect" (emphasis added), he or she is guilty of a class A misdemeanor.

Section 198.070(3). Thus, under section 565.188 a person charged with the duty to report is guilty of a class A misdemeanor if he or she fails to report the suspected abuse "immediately." But, under section 198.070, that same person is guilty of a class A misdemeanor if he or she fails to report the suspected abuse "within a reasonable time." Sections 198.070 and 565.188 therefore impose the same penalty for different acts. A defendant could be found guilty under one statute and not guilty under the other. It is persuasive that Missouri Elder Law, Sections 13.21, 13.22, and 13.23 (MoBar 2002), discusses separately the statutes regarding the reporting of elder abuse and points out the difference in the reporting times between section 565.188 (immediately) and section 198.070 (within a reasonable time).

The distinction between sections 565.188 and 198.070 reflects the nature of the different situations to which the statutes apply. There is a compelling argument that it is necessary to require immediate reporting under section 565.188 if there is suspected abuse of a person who is sixty years of age or older when that person is neither a resident of a facility under section 198.070 nor receiving in-home services under section 660.300. Presumably, the need for immediacy in section 565.188 arises when the person charged with the duty to report has limited contact with the abused person—limited in time and in the amount of information available about the abused person—and when there is an urgency to getting the abused person into protective care. Concomitantly, the duty to report within a reasonable time recognizes that the person who is a resident of a facility under section 198.070 or who is receiving in-home services under section 660.300 is already in an environment where other safeguards are in place to protect the abused person as well as to govern the reporting of abuse.

Because the offenses under section 198.070 and section 565.188 are different, the State could not choose under which statute to prosecute defendants. As discussed above, this is not a situation where a single act may constitute an offense under two different statutes and the State may elect under which statute to proceed. *See State v. Goebel,* 83 S.W.3d at 639 (a person failing to report income while receiving public assistance benefits in the form of money and food stamps could be charged with stealing by deceit or with the crime of stealing as it related to public assistance benefits); *State v. Grady,* 691 S.W.2d at 301(a person using someone else's credit card to buy gasoline and signing the credit card owner's name on the receipt could be prosecuted as a forgery or for fraudulent use of a credit device). *Grady* and *Goebel* are distinguishable from the present action, in that sections 198.070 and 565.188 do not make the identical conduct an offense under either statute, but make different conduct an offense under each statute.

The trial court erred in not granting defendants' motion for judgment of acquittal. The judgment of the trial court should be reversed. Because defendants' first point is dispositive, it is not necessary to address the remaining points. For the reasons stated, I dissent.